# IN THE SUPREME COURT OF TEXAS

══════════
No. 10-0950
══════════

ENBRIDGE PIPELINES (EAST TEXAS) L.P., PETITIONER,

v.

AVINGER TIMBER, LLC, RESPONDENT

══════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS
══════════════════════════════════════════════

**Argued February 27, 2012**

JUSTICE LEHRMANN delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE WAINWRIGHT, JUSTICE MEDINA, and JUSTICE GUZMAN joined.

JUSTICE JOHNSON filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE WILLETT joined.

This case involves a dispute over the fair market value of acreage on which a gas processing facility is located. We must decide whether the trial court abused its discretion by admitting an expert's testimony that allegedly violated the value-to-the-taker rule, which prohibits measuring land's value by its unique value to a condemnor in determining a landowner's compensation. We hold that the expert's testimony violated the rule because it impermissibly focused on the condemnor's interest in retaining the property and was therefore inadmissible. Because the court

of appeals erred when it concluded that the trial court did not abuse its discretion, we reverse and remand to the trial court.

Almost forty years ago, the predecessors in interest of Avinger Timber, LLC leased twenty-four acres to a gas processing company so the company could build and operate a gas processing facility. The lease gave the gas processing company an endless right of renewal. The land was in one of the state's most productive counties for natural gas and already had many pipelines running underneath it. A large gas processing facility was built, and easements were freely granted by Avinger for additional pipelines, roads, and a high-voltage electric line. In 1998, the lease was renewed, but without the endless right of renewal, giving Avinger a reversionary interest in the land. Enbridge Processing, LP ("Enbridge Processing") took over as the lessee. When the expiration date for the lease was looming and the parties were unable to agree on a rental price for renewal, Enbridge Processing merged with a public utility, Enbridge Pipelines (East Texas) L.P. ("Enbridge Pipelines"), and filed a condemnation petition to condemn the land. The commissioners awarded Avinger $47,580, but Avinger objected to the commissioners' default award and went to trial on the issue of fair market value of the condemned acreage. Challenges were made to each party's expert. The trial court allowed Avinger's expert's testimony but excluded the testimony of Enbridge Pipelines's expert. The jury awarded Avinger $20,955,000 as just compensation for the tract, and the trial court rendered judgment on that verdict. The court of appeals affirmed, holding that Avinger's expert's testimony did not violate the value-to-the-taker rule, which prohibits measuring a land's unique value to a condemnor, and the project-enhancement rule, which prohibits consideration of any enhancement to the value of the property that results from the taking itself. The court of appeals held that the jury

was entitled to consider the value of improvements constructed by prior lessees and the cost savings to a potential purchaser.

We must decide whether Avinger's expert's testimony should have been excluded. Because we hold that the trial court abused its discretion by admitting testimony that violated the value-to-the-taker rule by impermissibly focusing on Enbridge Pipelines' cost savings, we reverse and remand to the trial court.

## I. Factual and Procedural History

In 1973, the Simpson family, which owns Avinger, leased a 23.79-acre portion of their 418 acres to a gas processing company, Tonkawa Gas Processing Company, so that Tonkawa could build and operate gas processing facilities. Tonkawa was a private company that lacked condemnation power. At the time of the lease, the land already had several pipelines running underneath it. The 1973 lease was a ten-year lease that gave the lessee the perpetual option to renew for an additional ten years, giving the lessee an endless right of renewal. Annual rent was $500. Both parties had the right to arbitrate if no agreement was reached on new rents. The lessee was "the sole owner" of "all gas processing facilities and other improvements" on the property. If the lease expired, the lessee could remove its plant "within a reasonable time not to exceed six (6) months" or the landowner could "negotiate with [the lessee] for purchase" of the gas processing facility.

Tonkawa built a large natural gas processing facility on the land, and the Simpsons freely granted easements for roads, additional pipelines, and a high-voltage electric line. At least fifteen separate natural gas pipelines connected to the plant and the site became known as a gas processing hub in one of Texas's most productive counties. The lease was renewed in 1984 for fifteen years on

3

the same terms, except that the annual rent was increased to $4,000. Tonkawa then sold the plant to Koch Midstream Processing Company, which took over the lease interest, and Avinger became the successor lessor.

In 1998, Avinger renewed the lease with Koch, but on different terms. The lease term was reduced to three years with a three-year option. Annual rent was increased to over $21,000. Importantly, the language giving the gas processing company a right of never-ending lease renewals was removed, giving Avinger a reversionary interest in the land. Koch renewed the lease at the end of the three-year term, and Enbridge Processing became the gas plant operator and successor lessee after purchasing the lease and the plant from Koch. Like Tonkawa and Koch, Enbridge Processing was a private company that lacked the power of eminent domain.

With the lease expiration date nearing and the parties unable to agree on a rental price for a lease renewal, Enbridge Pipelines,[1] a public utility company, sent an offer to Avinger to purchase the land for $35,685. At the time Enbridge Pipelines sent the offer, it was not the owner of the gas processing facility or the lessee of the property. Avinger refused the offer. Enbridge Processing then merged with Enbridge Pipelines and secured the right to acquire the property through eminent domain. A petition for condemnation was filed, and the commissioners awarded Avinger $47,580 as compensation after it failed to appear at the valuation hearing. Avinger objected to the commissioners' default award and went to trial on the issue of fair market value.

---

[1] Enbridge Pipelines was a corporate affiliate of Enbridge Processing. .

4

At trial, Enbridge Pipelines's expert, Albert Allen, valued the property at $47,940, with the land's highest and best use as vacant rural residential property using sales comparison analyses. Avinger's expert, David Bolton, valued the property at $20,955,000, with its highest and best use as industrial property to house a gas processing plant. Bolton used a comparable sales methodology, two income approaches, and additional intrinsic value analyses in reaching his conclusion. In reaching the value of the property, Bolton relied on the provision in the lease which required the lessee to remove all improvements on the land within six months of the lease's termination. He testified that the value of the property to Enbridge would have been much greater than the $20,955,000 amount he concluded was its market value because the terms of the lease required Enbridge to remove its plant within six months, an obligation that Enbridge avoided by condemning the property. To determine the value added to Avinger's interest by Enbridge Pipelines's obligation to remove the gas plant, Bolton consulted with Donald Niemac, a gas-industry expert. Bolton's report stated that (1) the lease agreement was in effect at the time of the condemnation; (2) the lease agreement forms part of the fair market value of the land burdened by the lease; (3) the lease required the lessee to remove its improvements, including the gas processing facility; (4) Enbridge Pipelines, the condemnor, would not be removing the facility under the terms of the lease; and (5) Enbridge Pipelines's cost savings is incorporated into the value of the land.[2] Based on Niemac's testimony about practices in the gas processing industry, Bolton's expert report concluded that a prudent and knowledgeable investor,

---

[2] Bolton's report was not submitted to the jury, except for a single page. It was admitted, however, in a pre-trial hearing for the judge's consideration in determining admissibility. Although neither the report nor the testimony should have been admitted as proof of valuation, the dissent's focus on the report's not having been presented to the jury is misplaced. We discuss the report in assessing whether Bolton's opinion and its underlying methodology violated the value-to-the-taker rule.

5

considering Enbridge Pipelines's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest.

In calculating the comparable sales analyses, Bolton started with six similar industrial property sales with an average value of $13,480 an acre. Bolton then added value for the pipeline infrastructure and the lessee's cost of complying with the lease by removing the improvements on the land, reaching a value of $22,000,000, or $924,758 per acre. Bolton also valued the land using the discounted cash flow method and the direct capitalization method. Under the discounted cash flow method, Bolton reached a value of $18,904,350. To reach this amount, Bolton speculated that Avinger and Enbridge Pipelines would renew the lease for three additional years and that Enbridge Pipelines would pay $63,158 in rent over the three year term. Bolton calculated Avinger's reversionary interest in the fourth year as being worth $22,000,000, the value reached for his comparable sales analyses. Under the direct capitalization method, Bolton relied on the cost savings to Enbridge Pipelines in avoiding business disruption and reached a value of $22,275,000. Although Bolton's expert report concluded that a prudent and knowledgeable investor, considering Enbridge Pipelines's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest, at trial, he testified that the land was still worth $20,955,000 even if Enbridge Pipelines did not exist and the plant was "swept away by a tornado."

Both Avinger and Enbridge Pipelines moved to exclude the other party's expert's testimony. Enbridge Pipelines argued that Bolton's testimony impermissibly relied on project-enhancement by considering the enhancements in the property's value resulting from the taking and value-to-the-taker by considering the land's unique value to Enbridge Pipelines. Avinger contended that Allen's

testimony was flawed because it did not appraise the land as it existed on the date of the taking— he falsely assumed the property was vacant and barren. The trial court denied Enbridge Pipelines's motion to exclude Bolton's testimony, and granted Avinger's motion to exclude Allen's testimony. The jury awarded Avinger $20,955,000 as compensation, and the trial court rendered judgment on the verdict.

The court of appeals affirmed the trial court's judgment. 326 S.W.3d 390, 396. The court of appeals held that the jury was entitled to consider the improvements constructed by prior lessees and the cost savings to a potential purchaser to avoid removing and either relocating or replacing the plant. *Id.* at 405–06. The court of appeals held that Bolton's testimony did not violate the value-to-the-taker rule, since the value of the tract as a gas processing facility was not unique to Enbridge Pipelines. *Id.* at 406–08. Additionally, the court of appeals held that the testimony did not violate the project-enhancement rule, since the land's value was not a result of the taking itself and the plant had enhanced the value of the land long before Enbridge Pipelines manifested an intent to condemn the tract. *Id.* at 408. The court of appeals also affirmed the trial court's exclusion of Enbridge Pipelines's expert's testimony, stating that "[t]he trial court was within its discretion to conclude Allen's opinion was unreliable." *Id.* at 413.

## II. Valuation in a Condemnation Proceeding

"Compensation for land taken by eminent domain is measured by the fair-market value of the land at the time of the taking." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 627 (Tex. 2002); *see City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex. 2001). The objective of the condemnation process is to make the landowner whole. *See* TEX. CONST. art. I, § 17 (guaranteeing

"adequate compensation"). The factfinder may consider the highest and best use of the condemned land. *Zwahr*, 88 S.W.3d at 628. There is a presumption that the highest and best use of the land is the existing use of the land. *Id.; see also United States v. 841 Acres of Land*, 680 F.2d 388, 394–95 (5th Cir. 1982).

Enbridge Pipelines contends that the trial court erred in admitting Bolton's testimony, as it violated both the value-to-the-taker rule and the project-enhancement rule. Enbridge Pipelines also challenges the exclusion of Allen's testimony. Avinger responds that Bolton's testimony properly valued the land's fair market value and did not violate either the value-to-the-taker or the project-enhancement rule. Avinger also argues that Allen's testimony was properly excluded.

The trial court must act as an evidentiary gatekeeper to exclude irrelevant and unreliable expert evidence. *Zwahr*, 88 S.W.3d at 629. It has broad discretion with respect to this function. *Id.* In determining whether an abuse of discretion occurred in the inclusion of Bolton's testimony and the exclusion of Allen's, we look to see whether the trial court acted without reference to guiding principles or rules. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

An expert's testimony must be relevant to the issues and based upon a reliable foundation. TEX. R. EVID. 702; *Zwahr*, 88 S.W.3d at 628. Expert testimony is unreliable if "there is too great an analytical gap between the data the expert relies upon and the opinion offered." *Zwahr*, 88 S.W.3d at 629; *accord Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998). If an appraiser utilizes improper methodology or misapplies established rules and principles, the resulting testimony is unreliable and must be excluded. *Zwahr*, 88 S.W.3d at 631.

8

**A. Bolton's testimony violated the value-to-the-taker rule and was therefore inadmissible.**

Enbridge Pipelines contends that Bolton's testimony violated both the value-to-the-taker rule and the project-enhancement rule. Avinger responds that Bolton's testimony properly reflected the fair market value of the tract and did not violate either the value-to-the-taker nor the project-enhancement rule. We hold that Bolton's testimony violated the value-to-the-taker rule by improperly focusing on the costs Enbridge Pipelines saved by avoiding its obligation to remove the plant under the lease agreement and remand to the trial court. Since a violation of either the value-to-the-taker rule or the project-enhancement rule would require us to remand the case to the trial court, we need not reach the issue of whether the testimony also violated the project-enhancement rule.

"[T]he objective of the judicial process in the condemnation context is to make the landowner whole." *Zwahr*, 88 S.W.3d at 628. In measuring the landowner's compensation for condemned property, "the question is, what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910); *accord United States ex rel. TVA v. Powelson*, 319 U.S. 266, 281 (1943) ("[I]t is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken.") The value-to-the-taker rule prohibits an owner from receiving an award based on a tract's special value to the taker, as distinguished from its value to others who may or may not possess the power to condemn. *See City of Dallas v. Rash*, 375 S.W.2d 502, 505 (Tex. Civ. App.—Dallas 1964, writ ref'd n.r.e.) (citing *United States v. Miller*, 317 U.S. 369, 375 (1943)).

Avinger owned 23.79 acres of land that had been the site of a gas processing facility for thirty-one years. The lease stated that the lessee owned its improvements, including the gas processing

facility. The lease required Enbridge Pipelines to remove the plant from the land and restore Avinger's land to its original condition. The only interest that should have been appraised was Avinger's interest in the land. However, as we explain, this was not the interest that was valued in Bolton's report.

Avinger was entitled to have its land valued using its highest and best use. *See Zwahr*, 88 S.W.3d at 628. It is presumed that the land's highest and best use is that of its existing use, which in this case was the site of a gas processing facility. *See id.* Indeed, it appears that the land was uniquely situated to be the site of a gas processing facility. The land had a thirty-one year history as a gas processing site with all the required permits, had over fifteen separate natural gas pipelines running underneath it, each with its own easement, was connected to a high-voltage electricity line, and was located in one of Texas's most productive counties. The value of the land as a gas processing site is not exclusive to Enbridge Pipelines. Although Avinger was entitled to compensation for the distinct suitability of its land for a gas processing site, it was not entitled to be compensated for the land's unique value to Enbridge Pipelines as a result of the lease's terms.

Although Bolton testified that the land was worth $20,955,000 even if Enbridge Pipelines did not exist and the plant was "swept away by a tornado," other portions of Bolton's testimony flatly contradict those statements. Bolton's assessment was premised on the provision in the lease which required the lessee to remove all improvements on the land within six months of the lease's termination. Bolton's analysis explicitly took Enbridge Pipelines's cost savings into account. Bolton testified that his analysis took the existence of the plant into consideration, but he also testified that the land would have the same value if the plant did not exist. It is apparent that Bolton was not

10

valuing the 23.79 acres improved by the pipeline infrastructure that Avinger lost, but rather the gas processing facility that Enbridge Pipelines gained. His analysis took into account the costs of building a new plant and Enbridge Pipelines's moving costs. In discussing the various appraisal techniques used and explaining that the cost approach was not applicable in this case, Avinger's expert testified that the "cost to relocate or disassemble and move the plant *is a cost that we have to analyze* because it's a factor of the lease." (Emphasis added). Even the testimony pointed out by the dissent acknowledges that Avinger's expert considered what "would have to be done to move this plant per the lease." These moving costs were amounts that Enbridge Pipelines saved by condemning the property; they did not enhance the value of the land that Avinger lost. Enbridge Pipelines is not required to pay more because it avoided the cost of removing the plant. Bolton's testimony "runs counter to the uniformly announced rule . . . that the condemnee is compensated for his loss . . . and not for any special advantage or benefit which may come to the condemnor." *See United States v. Hayman*, 115 F.2d 599, 601 (7th Cir. 1940). We do not suggest that Avinger's experts should not have considered the effect, if any, that the lease (which expired before the taking occurred) had on the value of the property as required by the Uniform Standards of Professional Appraisal Practice (USPAP). Certainly, it was proper for any amountthat the lease added to the value of the property taken to be considered. However, it was not proper for the experts to consider the cost of removing the plant, as Enbridge was required to do within six months of the expiration of the lease, because of the special value this aspect of the lease provided to Enbridge. Therefore, we hold that Bolton's testimony violated the value-to-the-taker rule because it impermissibly focused on the benefit to Enbridge Pipelines in avoiding the cost of removing the plant. The trial court abused its discretion

11

by admitting the portion of Bolton's testimony that was premised on Enbridge Pipelines's removal obligation under the lease agreement.

**B. The trial court did not abuse its discretion by excluding Allen's testimony.**

Enbridge Pipelines also asserts that the trial court committed an abuse of discretion by excluding Allen's testimony. Avinger responds that Allen's testimony was properly excluded because it valued the land as vacant and unimproved rural residential property. We agree that the trial court did not abuse its discretion in excluding Allen's testimony.

This Court "must uphold the trial court's [decision to exclude evidence] if there is any legitimate basis for the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998) (citing *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 (Tex. 1989)). Allen valued the property with its highest and best use as vacant rural residential property. The presumed highest and best use of land is that of its existing use, which in this case was a gas processing facility. *See Zwahr*, 88 S.W.3d at 628. "[T]he landowner can rebut this presumption by showing a reasonable probability that when the taking occurred, the property was adaptable and needed or would likely be needed in the near future for another use." *Id.* However, the property had a thirty-one year history as a natural gas facility and there is no evidence indicating that the property was adaptable and needed as residential property in the foreseeable future. Allen did not show why the existing use of the property was not the highest and best use.

"Unless an appraisal gives a value based on the land's condition at the time of condemnation—taking into account all relevant factors that affect its valuation, including the market for its possible future use—it is not relevant to the issue of market value." *Sharboneau*, 48 S.W.3d

12

at 185. Not only did Allen's testimony fail to explain why the existing use of the property was not the highest and best use, his opinion did not offer fair market value of the land based on its condition at the time of condemnation and did not account for all relevant factors affecting valuation. His opinion did not account for the land's thirty-one year history as a gas processing site with all the required permits, the fifteen separate natural gas pipelines running underneath the land, each with its own easement, the site's connection to a high-voltage electricity line, and the land's location in one of Texas's most productive counties. Therefore, the court of appeals did not err in holding that the trial court did not abuse its discretion by excluding Allen's testimony.

### III. Conclusion

We hold that the trial court did not abuse its discretion by refusing to admit Allen's testimony but did abuse its discretion by admitting the portion of Bolton's testimony premised on Enbridge Pipelines's obligation to remove the plant under the lease agreement, which violated the value-to-the-taker rule by impermissibly valuing the costs Enbridge Pipelines saved by condemning the land and avoiding the removal obligation of the lease. Because Bolton's testimony was inadmissible, we reverse and remand to the trial court.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** August 31, 2012

13