

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00144-CV

Katherine Elizabeth **WILLIAMS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 2, Guadalupe County, Texas
Trial Court No. 09-1797-CV
Honorable W.C. Kirkendall, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:       Catherine Stone, Chief Justice
               Marialyn Barnard, Justice
               Luz Elena D. Chapa, Justice

Delivered and Filed:  June 19, 2013

AFFIRMED

This is an appeal from a statutory condemnation case. *See* TEX. PROP. CODE ANN. § 21 (West 2004 & Supp. 2012). Katherine Williams was the owner of two adjoining tracts in Guadalupe County, which the State offered to purchase in order to construct State Highway 130. *See id.* § 21.0113 (West 2004 & Supp. 2012). Williams did not accept the State's offer, but she did execute a Possession and Use Agreement (PUA) with the company constructing the highway. The PUA allowed the company to take possession of Williams's property in March 2009 in exchange for paying Williams $183,000—the amount of the State's original offer. The State was

named as a third-party beneficiary to the agreement. In September 2009, the State began condemnation proceedings, and Special Commissioners were appointed to determine the value of Williams's property. *See id.* §§ 21.012; 21.014 (West 2004 & Supp. 2012). The Special Commissioners awarded Williams $495,000. The State objected to the award, converting the administrative proceeding into a civil trial before the county court at law. *See id.* § 21.018 (West 2004). The State deposited into the registry of the court the amount of the Special Commissioners' award less the amount paid in the earlier agreement, or $312,000. *See id.* § 21.021 (West 2004). Williams withdrew the rest of the award. *See id.* § 21.0211 (West 2004 & Supp. 2012). After the trial, the jury found the fair value for Williams's land to be $250,000, and the trial court rendered a deficiency judgment against Williams for $245,000. *See id.* § 21.044(b) (West 2004). Williams now appeals. She contends the jury's verdict rests on unreliable expert testimony; the trial court wrongly denied her separate valuation trials or separate jury charges on each tract she owned; and the calculation of the court's judgment was procedurally flawed. We affirm.

## TWO PROPERTIES OR ONE?

Williams's second point of error asserts the trial court was obligated to sever the condemnation proceeding into two separate trials, one for each tract as she originally acquired them.[1] She argues the State could not legally condemn both tracts in the same proceeding and severance would have avoided many of the alleged problems in the appraisal provided by the State's expert appraiser, Lynn Eckmann. In the alternative, she claims the court erred by not

---

[1] The State argues Williams failed to preserve error because she did not obtain a ruling from the trial court and no written motion appeared in the record. *See* TEX. R. APP. P. 33.1. The Guadalupe County Clerk eventually filed a supplemental clerk's record containing the motion to sever. The reporter's record shows the trial court held a hearing and told the parties it would inform them of its ruling in a letter. No letter appears in the record, but the trial court implicitly denied the motion by starting the trial one month later. Williams preserved her complaint.

submitting her proposed jury charges that asked for the separate value of each tract.  Williams's property is displayed in the following images that were reproduced from the record.





**Severance**

"That a claim *may* be severed does not always mean it *must*." *In re Wilkerson*, No. 14-08-00376-CV, 2008 WL 2777418, at *1 (Tex. App.—Houston [14th Dist.] June 6, 2008, orig. proceeding) (per curiam) (mem. op.); *see* Tex. R. Civ. P. 41, 174(b). Accordingly, we review the trial court's decision to deny severance for abuse of discretion. *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 693 (Tex. 2007). To qualify for severance, a party must first show: (1) the controversy involves multiple causes of action; (2) the severed claims would be the proper subject of a lawsuit if independently asserted; and (3) the severed claims are not so interwoven with the remaining action that they involve the same facts and issues. *In re State*, 355 S.W.3d 611, 614 (Tex. 2011) (orig. proceeding). The controlling reasons to grant severance are to "avoid prejudice, do justice, and increase convenience." *Id.* at 613. Therefore, the trial court has a duty to sever only "'when all of the facts and circumstances of the case unquestionably require a separate trial to prevent manifest injustice, and there is no fact or circumstance supporting or tending to support a contrary conclusion and the legal rights of the parties will not be prejudiced thereby.'" *In re Reynolds*, 369 S.W.3d 638, 650 (Tex. App.—Tyler 2012, orig. proceeding) (quoting *Womack v. Berry*, 291 S.W.2d 677, 683 (Tex. 1956) (orig. proceeding)).

Williams first argues the State needed to show Williams's two tracts shared unity of use and ownership before condemning them together, and without that showing, the court should have granted her motion to sever. The statute she cites sets out the requirements of a condemnation petition, including a description of the property and the name of the owner. Tex. Prop. Code Ann. § 21.012(b)(1), (3) (West 2004 & Supp. 2012). It is, however, silent about unity of use and ownership. *See id.* We note that Williams was the sole owner of the two tracts at

the time of the taking.[2] And the cases to which Williams directs us require *landowners* in partial-condemnation cases to show that the condemned tract and the remainder tract shared unity of use and ownership in order to claim damages to the remainder tract, and are therefore not on point. *See Taub v. City of Deer Park*, 882 S.W.2d 824 (Tex. 1994); *Gossett v. State*, 417 S.W.2d 730 (Tex. Civ. App.—Eastland 1967, writ ref'd n.r.e.). Williams has not shown the State had a burden to meet under the Property Code before it condemned her two tracts together in the same proceeding.

Moreover, in order to be entitled to a severance it was Williams's burden to show the severed claim was not so interwoven with the remaining claim that they involved the same facts and issues. Williams failed to meet this burden. The State's expert appraiser valued Williams's tracts as having their highest and best use as one whole property. Both of Williams's experts also testified about the value and the use of her land, starting from the premise that her tracts were best valued as one whole property. Neither of her experts testified about the value of the individual tracts as they were originally acquired. Her appraiser did divide her whole property into two *new* economic units because he judged developing two smaller units would maximize her property's value. But he did not divide these units along the original boundary line of Williams's tracts; he drew new boundaries that used the land more efficiently. Since both Williams and the State sought to establish the value of her property, starting from the premise that the tracts were best valued as one whole property, the facts and issues relating to both tracts were necessarily too interwoven to permit severance.

---

[2]When the State made its original offer to Williams, the "East Tract," which she had lived on for thirty years, was subject to a mortgage. The record reflects that the mortgage was paid in full from the proceeds of the PUA. Williams inherited the adjoining "West Tract" in 2006, subject to rights of first refusal held by her siblings. Rights of first refusal are interests in property that are not triggered until there is a voluntary sale of the property. *Benefit Realty Corp. v. City of Carrollton*, 141 S.W.3d 346, 350–51 (Tex. App.—Dallas 2004, pet. denied).

Williams also did not show she suffered any prejudice from the court's denial of her motion to sever. Her own expert testified about the value of the land as a whole, albeit divided into new economic units, and nothing barred Williams from presenting evidence about the independent value of each tract as they were individually acquired. Accordingly, the trial court did not abuse its discretion by implicitly denying the requested severance.

## Separate Jury Charges

A jury charge must reflect the evidence heard at trial. TEX. R. CIV. P. 278 ("The court shall submit the questions, instructions and definitions in the [jury charge], which are raised by the written pleadings and the evidence."). We have not been directed to nor have we found any evidence in the record about the value of each individual tract as she originally acquired them. The trial court rightly denied Williams's proposed separate value questions.

## RELIABILITY OF EXPERT WITNESSES

The trial court held pretrial hearings on the parties' motions to exclude each other's witnesses. The court found the opinion of Lynn Eckmann, the State's expert appraiser, to be reliable and allowed her to testify. After the jury verdict, Williams moved for a judgment notwithstanding the verdict (JNOV), arguing Eckmann's testimony was unreliable and therefore no evidence. In a single point of error, Williams argues the trial court erred in admitting Eckmann's testimony and denying her motion for JNOV. Both issues rest on the reliability of Eckmann's testimony.

## Standard of Review

Williams attacks the admission of Eckmann's testimony and contends that her testimony is legally insufficient to support the verdict. Proffered expert testimony is nothing more than an opinion, and does not rise to the level of evidence unless it passes muster under the Rules of Evidence. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997) ("The

testimony of an expert is generally *opinion* testimony. Whether it rises to the level of *evidence* is determined under our rules of evidence . . . ."). Therefore, if the only "evidence" supporting an issue is unreliable expert testimony, then it is really "no evidence," and the challenging party is entitled to judgment. *See id.* at 711–14, 730 (rendering judgment for Merrell Dow because the plaintiffs' experts in Bendectin litigation offered no reliable causation evidence). Because Williams challenges Eckmann's testimony as constituting "no evidence," we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict.[3] *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009); *Cent. Appraisal Dist. of Taylor Cnty. v. Western AH 406, Ltd.*, 372 S.W.3d 672, 688 (Tex. App.—Eastland 2012, pet. filed); *see also Goodyear Tire & Rubber Co. v. Rios*, 143 S.W.3d 107, 113 (Tex. App.—San Antonio 2004, pet. denied) ("Where the trial court has admitted expert testimony and, on appeal, the appellant challenges the expert testimony as constituting 'no evidence,' we consider whether the expert testimony is reliable under a de novo standard of review."). No-evidence review takes into account the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable. *Whirlpool Corp.*, 298 S.W.3d at 638; *U.S. Renal Care, Inc. v. Jaafar*, 345 S.W.3d 600, 606 (Tex. App.—San Antonio 2011, pet. denied).

### The Reliability Requirement of Rule 702

The proponent of expert testimony must show it to be reliable. TEX. R. EVID. 702, 703; *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998). Expert appraisal testimony is

---

[3]Typically, we would review the admission of an expert appraiser's opinion under an abuse of discretion standard. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). In this case, Williams attacked the reliability of Eckmann's testimony through both a pretrial *Daubert/Robinson* motion to exclude and a motion for JNOV. The standard of review for a denial of JNOV is the same as the standard for our typical appellate no-evidence review. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."); *see also Johnson v. Methodist Hospital*, 226 S.W.3d 525, 528 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("An appellate court reviews a JNOV under a no-evidence standard of review.").

no different. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 809 (Tex. 2002). The reliability of expert scientific evidence is generally judged by the factors laid out in *Robinson*.[4] But the courts have recognized that the considerations listed in *Robinson* for assessing the reliability of scientific evidence cannot always be used with other kinds of expert testimony. *Gammill*, 972 S.W.2d at 726–27 (declining to apply the *Robinson* factors to expert engineering testimony, although it was scientific in nature); *see LaSalle Pipeline, LP v. Donnell Lands, L.P.*, 336 S.W.3d 306, 315 (Tex. App.—San Antonio 2010, pet. denied) (relying on the *Gammill* standard to evaluate expert appraiser's testimony). And in some cases, courts are justified in deciding that experience alone provides a sufficient basis for an expert's testimony. *Gammill*, 972 S.W.2d at 726; *see, e.g., Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("It is not error for an appraiser to use his or her personal experience and expertise to make certain determinations.").

Even without the aid of the *Robinson* factors, courts must still gauge the reliability of an appraiser's testimony. Expert testimony is unreliable if the expert uses an improper methodology or misapplies established legal rules and principles. *Enbridge Pipelines (East Texas) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 262 (Tex. 2012). We examine an expert's methods and analysis, not her conclusions. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Courts will also hold an appraiser's testimony to be unreliable if the appraiser violated well-established legal rules of valuation. *Enbridge Pipelines*, 386 S.W.3d at 262–64 (error to admit testimony of appraiser who violated value-to-the-taker rule by impermissibly considering the value saved by the condemnor-lessee because it would not have to remove its building at the end

---

[4]The factors are (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. 923 S.W.2d at 557.

of the lease; exclusion of another appraiser who failed to conduct proper highest-and-best use analysis was proper). We are not required to accept or take as true an expert's mere *ipse dixit*, but will determine whether there is "simply too great an analytical gap between the data and opinion proffered." *Gammill*, 972 S.W.2d at 726. So too, even if an expert says something would be a "wild-assed guess," we look at the substance of the opinion to determine its reliability. *State Farm & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 320 (Tex. App.—San Antonio 2002, pet. denied), *abrogated on other grounds by*, *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008).

We have previously recognized that "all appraisal opinion is at best something of a speculation, and the question of market value is peculiarly one for the fact finding body." *LaSalle Pipeline*, 336 S.W.3d at 315 (citing *Texas Pipe Line Co. v. Hunt*, 228 S.W.2d 151, 156 (Tex. 1950)); *see also Kempwood Plaza*, 186 S.W.3d at 161 ("Appraising property is not an exact science based on set mathematical formulas."). Texas courts have given appraisers a wide degree of latitude based on their experience when determining admissibility. *See Kempwood Plaza*, 186 S.W.3d at 161; *Collin Cnty. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 872–74 (Tex. App.—Dallas 2012, pet. denied). An expert's opinion testimony is not legally insufficient because it lacks market data to support the opinion. *McKinney Indep. Sch. Dist. v. Carlisle Grace, Ltd.*, 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007, pet. denied). Competing expert opinions are not legally insufficient because they contradict each other, but they do raise fact issues for the jury to resolve. *Id.* at 885.

## Determining Market Value

*What is Market Value?*

Compensation for land taken by condemnation is measured by the fair-market value of the land at the time of the taking. TEX. PROP. CODE ANN. § 21.042(b) (West 2004 & Supp. 2012);

*Enbridge Pipelines*, 386 S.W.3d at 261. The standard for market value is "'the price which the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it.'" *State v. Windham*, 837 S.W.2d 73, 77 (Tex. 1992) (quoting *State v. Carpenter*, 89 S.W.2d 194, 202 (Tex. 1936)); *LaSalle Pipeline*, 336 S.W.3d at 314. The "willing seller-willing buyer" test contemplates "that all factors should be considered which would reasonably be given weight in negotiations between a seller and a buyer." *City of Austin v. Cannizzo*, 267 S.W.2d 808, 814 (Tex. 1954).

*How is Market Value Determined?*

The three traditional methods of determining market value are the comparable sales method, the cost method, and the income method-capitalization method. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). The comparable sales method is the preferred approach in Texas courts. *Id.* Under the comparable sales analysis, the appraiser finds data for sales of similar property, and she then makes upward or downward adjustments to these sales prices based on differences in the subject property. *Id.*

If there is a limited market for the condemned property, the cost approach is often used. *State v. Whataburger, Inc.*, 60 S.W.3d 256, 262 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The first step in this approach is to determine the market value of the underlying land, free of any structures, via the comparable-sales method. *Id.* That figure is then added to the cost of reproducing the existing structures less their depreciation. *Id.*

*How is the Highest and Best Use of a Property Determined?*

In determining market value, the jury considers the highest and best use of the condemned property. *Enbridge Pipelines*, 386 S.W.3d at 261; *Carlisle Grace*, 222 S.W.3d at 883. When the highest and best use of property is disputed, the jury decides which use is appropriate when it determines market value. *See Windham*, 837 S.W.2d at 76–77; *State v. ADSS*

*Props., Inc.*, 878 S.W.2d 607, 614 (Tex. App.—San Antonio 1994, writ denied). The four factors considered when evaluating a property's highest and best use are legal permissibility, physical possibility, financial feasibility, and maximal productivity. *City of Sugar Land v. Home & Hearth Sugarland, L.P.*, 215 S.W.3d 503, 511 (Tex. App.—Eastland 2007, pet. denied). The existing use of the land at the time of the taking is presumed the highest and best use. *Enbridge Pipelines*, 386 S.W.3d at 261. The jury may consider other evidence of highest and best use if it is shown (1) the property is adaptable to other use; (2) the other use is reasonably probable within the immediate future, or a reasonable time, and (3) the market value of the land has been enhanced thereby. *Sw. Bell Tel. Co. v. Radler Pavilion Ltd., P'ship*, 77 S.W.3d 482, 486 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (citing *Cannizzo*, 267 S.W.2d at 814). The effect of zoning on highest and best use falls squarely into this rule because, as the Texas Supreme Court has observed, "[i]t is a matter of common knowledge that cities frequently lift zoning ordinances or reclassify property in particular zones when the businesses or wants of the community justify that type of action in the interest of the general public welfare." *Cannizzo*, 267 S.W.2d at 815. The inability to lay down a hard and fast rule rests in part on the recognition that market value is almost uniquely an issue for the factfinder. *Id.*

*Selection of Comparable Sales*

For the comparable-sales method to be reliable as applied, the comparable sales must actually be comparable. Comparable sales must be voluntary, should take place near in time to the condemnation, and must involve land with similar characteristics. *Sharboneau*, 48 S.W.3d at 182; *Hixon Family*, 365 S.W.3d at 870. Comparable sales need not be in the immediate vicinity of the subject land so long as they meet the test of similarity. *Sharboneau*, 48 S.W.3d at 182; *LaSalle Pipeline*, 336 S.W.3d at 316 (no rule requires appraiser to locate properties in the same county as the appraised property before looking outside the county). But if the comparison is so

attenuated that the appraiser and the fact-finder cannot make valid adjustments for these differences, a court should not admit the sale as comparable. *Sharboneau*, 48 S.W.3d at 182. Comparable sales are generally admissible unless it appears that reasonable minds cannot differ from the conclusion that the evidence of the other sales lack probative force because of their dissimilarity to the condemned property. *Hixon Family*, 365 S.W.3d at 868–69; *Bridges v. Trinity River Auth.*, 570 S.W.2d 50, 56 (Tex. Civ. App.—Tyler 1978, writ ref'd n.r.e.). And a court's discretion "is also very broad in determining whether 'a sale is sufficiently similar to be admissible as a circumstance influencing an expert witness in arriving at his opinion of value.'" *Hixon Family*, 365 S.W.3d at 869 (quoting *Tex Elec. Serv. Co. v. Graves*, 488 S.W.2d 135, 139 (Tex. Civ. App.—El Paso 1972, writ ref'd n.r.e.)). One general rule of exclusion is when the condemned property is raw acreage, it is improper to admit evidence of hypothetical nonexistent subdivisions. *Boswell v. Brazos Elec. Power Co-op., Inc.*, 910 S.W.2d 593, 601 (Tex. App.—Fort Worth 1995, writ denied).

*Adjustments*

Valid adjustments are an essential element of the comparable sales method. *Sharboneau*, 48 S.W.3d at 182; *see also* TEX. TAX. CODE ANN. § 42.26(a)(3) (West 2008) ("The district court shall grant relief on the ground that a property is appraised unequally if . . . the appraised value of the property exceeds the median appraised value of a reasonable number of comparable properties appropriately adjusted."); *Harris Cnty. Appraisal Dist. v. Houston 8th Wonder Property, L.P.*, 395 S.W.3d 245, 254–55 (Tex. App.—Houston [1st Dist.] 2012, pet. filed). When using the judicially approved comparable sales methodology, it is appropriate for an appraiser to adjust properties based on her own experience. *Kempwood Plaza*, 186 S.W.3d at 161; *Hixon Family*, 365 S.W.3d at 872–74. Alleged "gaps" between the comparable sales data and the conclusions drawn from it may go to the weight of an appraiser's testimony but not to its

admissibility. *LaSalle Pipeline*, 336 S.W.3d at 318; *Kempwood Plaza*, 186 S.W.3d at 161; *Hixon Family*, 365 S.W.3d at 872–74. We nevertheless review the adjustments to determine whether too great an analytical gap exists from the data to the adjustment. *See LaSalle Pipeline*, 336 S.W.3d at 318; *Kempwood Plaza*, 186 S.W.3d at 161.

### Eckmann's Appraisal

Eckmann valued Williams's entire property at $210,000. She formed her opinion by comparing the difference between the results of two methods of valuing the property: the cost approach, giving a value of $217,000, and the improved sales comparison approach that gave a value of $205,000.

Eckmann's appraisal began by examining Williams's property. Because the State had already demolished Williams's home, Eckmann looked at tax appraisal records, reviewed previous appraisals the State had ordered, investigated the neighborhood, and gathered all available factual information such as floor plans, photographs, zoning restrictions, and physical features. She determined the neighborhood consisted of rural, vacant tracts of land, scattered single family residences, and scattered light industrial and commercial development. She noted Williams's property was within Seguin city limits and was commercially zoned, although the majority of the surrounding land was still zoned as agricultural ranch. Eckmann decided William's tracts would have more value as one combined parcel because splitting it into two economic units was disadvantageous. The units would have to share a driveway, would require long and skinny buildings, and would have a hard time locating a required detention pond.

She used two appraisal methods to value the property—the cost approach and the comparable sales approach. To assess the value of the land as vacant, which had a highest and best use as commercial development, she used the cost approach. When she assessed the value of

the land as improved, with a highest and best use as a single-family residence, she used the comparable sales method.

*Cost Approach—Vacant Commercial Use*

If the land were vacant, Eckmann determined the highest and best use of the land would be for commercial purposes. This is because Williams's property, if vacant, would have to be developed commercially due to zoning. In her judgment, the parcel was best valued as one economic unit, 4.6 acres being an acceptable size for commercial property in that area. Williams does not ascribe any error to Eckmann's determination that the highest and best use of the property as vacant was commercial.

Eckmann first calculated the value of the structure on Williams's property less its depreciation and came to a value of approximately $102,000.

She then selected four sales of vacant land which she felt were comparable to Williams's property and also had a commercial highest and best use. Her comparable sales were:

1. An 18.710 acre lot located on Highway 90-A; it sold in April 2010 for $12,004 per acre. Eckmann testified the property was similar to Williams's property in location and its utilities. It was also bisected by a natural gas pipeline easement.

2. An 8.05 acre tract located on the northwest side of IH-10 about 1000 feet southeast from Farm Road 725, and it sold for $21,000 per acre in September 2009.[5] The tract was located near an in-development Love's Truck Stop, was about to be connected to utilities from the City of Seguin, and was more regularly shaped than Williams's property.

---

[5] At her deposition, Eckmann testified the tract sold for $200,000. By the time of trial, she had learned more about the tract's financing, which raised the sales price to $250,000. She adjusted the rest of her analysis accordingly.

3. A 3 acre tract on the southeast side of Highway 90 but close to the intersection of I-10 and Highway 90. It sold for $31,667 per acre. It had three platted lots and had some drainage issues in one corner.

4. The last tract was 2.04 acres on the southeast side of Highway 90, and sold for $14,951 per acre. It was about 3 miles from Williams's property and 1 mile west of Kingsbury. The property also had some minor drainage issues, but it was more regularly shaped than Williams's property.

Williams objected to all the comparable sales. She complains the first two sales were not comparable because Eckmann testified they were "raw, undeveloped land," but Williams's property was "subdivided, zoned parcels with all the necessary amenities." *See City of Odessa v. Meek*, 695 S.W.2d 775 (Tex. App.—El Paso 1985, no writ). Williams does not explain what amenities her land enjoyed that the compared properties did not, and the record indicates that the compared properties' utilities were either comparable or even superior to Williams's property. Also, we cannot locate in the record where any witness testified Williams's property was subdivided and in fact the record implies otherwise. Rather, Williams's property was composed of two tracts acquired at different times.

Williams also objects to all the comparable sales because they were outside the City of Seguin city limits and were not zoned. We have not found authority requiring comparable properties to be within the same city limits as the subject property. *See Hays v. State*, 342 S.W.2d 167, 172 (Tex. App.—Dallas 1960, writ ref'd n.r.e.) (rejecting objections that comparable sales were not in the same city limits as the subject property were invalid); *LaSalle Pipeline*, 336 S.W.3d at 316 (no rule requires appraiser to locate properties in the same county as the appraised property before looking outside the county). Eckmann's comparable sales were similar in location to Williams's property because they were located around the periphery of Seguin. We

have also not found any authority holding a property's status as zoned property *per se* bars its comparison to unzoned property.

Williams also argues that the properties were too dissimilar in size. However, Williams's argument considers each of her tracts individually, rather than the property as a whole. Eckmann evaluated the property as a whole, and Williams has not shown that Eckmann could not make valid comparisons for size. *See Sharboneau*, 48 S.W.3d at 182.

Williams's last argument on comparability is that the drainage issues on the fourth tract would prevent development of that tract. Williams offered evidence about how the drainage issues might affect development but, in light of Eckmann's contrary testimony, Williams has not shown how any potential drainage issue was so bad it could not be a comparable property. *See Hixon Family*, 365 S.W.3d at 870.

Finally, Eckmann made adjustments to the sale price of each comparable sale. If she considered Williams's property superior to the comparable property in some aspect, she adjusted the sale price of the compared property upward. Likewise, if Williams's property was inferior in some aspect, Eckmann adjusted the compared property's sale price downward. To adjust for differences in size between the properties, Eckmann used an adjustment of "10% per doubling." Eckmann testified she does not make direct dollar-per-acre adjustments when accounting for differences in size. In her opinion, smaller commercial properties generally have a higher dollar-per-acre value.[6] Her "10% per doubling" formula adjusted downward the per-acre value of a comparable property by 10% for every factor of two that it was larger than Williams's property because it is less valuable on a per-acre basis. Likewise, she adjusted upward the per-acre value

---

[6]Eckmann's report states: "Typically, [the size] adjustment is based upon the general premise that the larger a parcel, the lower the price per denominator. Conversely, the smaller the parcel, the higher the price per denominator. Smaller tracts generally sell for more per square foot than do larger tracts. A greater pool of investors is capable of purchasing smaller tracts which require smaller capital outlay, thereby increasing the effective demand for smaller sites."

of comparable property for every factor of two that it was smaller than Williams's property. *See LaSalle Pipeline*, 336 S.W.3d at 317–18 (appraiser's explanation and consistent application of percentage adjustment passes Rule 702).

Williams particularly complains about Eckmann's lack of market data to support the manner in which she calculates adjustments, and the manner in which she applies methods outlined in the Appraisal of Real Estate. Eckmann appears to have used a hybrid qualitative/quantitative method of adjusting for various elements. Eckmann may or may not have perfectly applied the guidelines promulgated by the Appraisal Institute—but a court's determination of an appraiser's reliability does not hinge on the appraiser's slavish adherence to those guidelines. We look to the appraiser's experience and stated rationales for the adjustments and examine whether there is too great an analytical gap between that and her conclusion. *See id*. Whether or not she properly applied the rigorous Appraisal Institute guidelines is a matter best left to cross-examination. *See Gammill*, 972 S.W.2d at 728 ("The trial court's gatekeeping function under Rule 702 does not supplant cross-examination as 'the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)); *Weingarten Realty Investors v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Nor does Eckmann's lack of independent market data to support the exact value of every adjustment she made render her testimony unreliable as a matter of law. *Carlisle Grace*, 222 S.W.3d at 882. The lack of market data goes to the weight of her testimony and not its reliability. *See id.*; *LaSalle*, 336 S.W.3d at 317–18; *Hixon Family*, 365 S.W.3d at 872–73; *Kempwood Plaza*, 168 S.W.3d at 161.

After adjusting all the properties, Eckmann came to an averaged value for the land of approximately $92,000. Eckmann then added the value of the land to the value of the house less its depreciation to arrive at a value of $217,000.

*Comparable-Sales Approach—Improved Residential Use*

Eckmann also used a pure comparable sales approach to value the land as improved. Williams complains that Eckmann wrongly considered the highest and best use of the land as improved to be single-family residential because the whole parcel could not be used residentially and it would not be the most valuable use. She also complains that Eckmann's comparable sales were outside the city limits and not subject to zoning. Williams further complains Eckmann did not consider commercial uses in the improved-sales analysis or in selecting improved sales with commercial potential, which Williams did have. And finally, Williams again objects to Eckmann's adjustments.

Williams's objection to Eckmann's conclusion about the property's highest and best use as improved rests on a "paired-sales analysis" Williams's appraiser did to determine whether residential or commercial use would maximize the property's value. The probative value of that paired-sales analysis was disputed, as the State showed on cross examination that the location of the two parcels and the surrounding development were vastly different in addition to the difference in use. In a proper paired-sales analysis, the compared properties should have only a single element of difference in order to compute the value of that difference. As such, Williams cannot rely on that analysis to conclusively show that commercial use was overwhelmingly the maximally productive use of the property and that Eckmann could not have come to a different conclusion. *See Carlisle Grace*, 222 S.W.3d at 885.

Eckmann determined selling the property in its current condition would have the highest and best use as a continued single-family residence. Her research indicated the property, despite its commercial zoning, would be permissibly used as a single-family residence because such use was a legally nonconforming use under the City of Seguin's zoning ordinance. She also testified

that there would be certain costs incurred if the building were to be used commercially because it would have to meet several requirements, including ADA compliance.

City zoning ordinances generally restrict the development, operation, and use of property that falls within the city's jurisdiction. Seguin's zoning ordinance permits property owners to use their property in a way that does not conform to the applicable zoning, so long as their use of the property was the existing use at the time the unfavorable zoning came into effect. Seguin, Tex., Ordinance 884, § 40 (April 15, 1989). Such uses are termed as legally nonconforming uses. *Id.* With respect to combined land-and-structure uses, any part of the premises which was not devoted to the nonconforming use at the time of the change may not have the nonconforming use extended to it. *Id.* § 40(C)(3).

We hold the evidence permits the conclusion that Williams's entire property was devoted to single-family use and the applicable zoning ordinance would have allowed the existing use to continue. Eckmann and Williams's own expert, Donald Graham, testified that all the land surrounding Williams's property was used residentially together with Williams's house, and that it would be a legally nonconforming use for the land to continue to be used in such a way. Williams did not deny she made residential use of the tract, which she inherited at a more recent time from her father, but rather testified she did not have living quarters on it, although it was separately fenced. The record indicates the fence did not line up with the actual boundary between the two tracts either. The evidence indicates all the land surrounding the house was used in conjunction with it. Thus, the continued use of the land in conjunction with the house was a legally nonconforming use. As the existing use of the property, the presumption is that the highest and best use of the property was residential. *Enbridge Pipelines*, 386 S.W.3d at 261

Williams claims that the existing use was mixed commercial and residential because at one point Williams's then-husband ran a printing business out of the house and for some time

before the condemnation Williams had been storing antiques in her house with an eye toward opening an antique shop from her home. Storing objects for a future business and a past use of the home as the base for a printing business does not compare with almost thirty years of uninterrupted residential use. Eckmann could discount such *de minimis* commercial activity in deciding the property's current use was residential. We cannot find error in Eckmann's highest and best use determination.

Eckmann also had four comparable residential sales for her improved comparison. They were single-family residences situated to the east and northeast of Seguin. Her final value for the property as improved was $205,000.

1. Her first sale located on Highway 90-A sold in May 2009 for $227,000. The residence was 2,755 square feet located on 2.168 acres and sold for $82.40 per square foot.

2. Her second sale was off a road off of Highway 90 in April 2009 for $190,700; the house was 2,068 square feet on 2.793 acres. It sold for $92.21 per square foot.

3. Her third sale was again on a road off of Highway 90 and sold in October 2008. It was on 2 acres and contained 2,200 square feet of housing. It sold for $72 per square foot. The sale price was $158,400.

4. Her final sale was on Farm Road 20 that sold in March 2008 for $225,000. It was 5 acres with 2228 square feet and sold for $100.00 per square foot.

All of the compared properties were adjusted for factors such as differences in lot size, living area, number of bathrooms, car storage, fireplaces, and other amenities that willing buyers and sellers would consider in a voluntary sale.

Williams complains that none of the improved comparable properties had any commercial potential as Eckmann conceded Williams's parcel did. That may be a relevant consideration about the weight of her comparables, but Eckmann's highest and best use analysis

was for residential single-family use and her selected comparable properties matched that use. Case law does not support the contention that just because a residential site has some semblance of commercial potential, every comparable property must likewise have some semblance of commercial potential as well. Williams also complains that compared sales 2 and 3 were located off private roads, but Eckmann made an adjustment for that feature, and Williams does not explain why that makes them so incomparable that reasonable minds could not find them to hold any probative force. *See Hixon Family*, 365 S.W.3d at 868–69.

Finally, Williams again complains about Eckmann's adjustments being wholly unsupported by market data or based on an improper methodology. Once again, the manner in which adjustments are made is within the sound discretion of the appraiser and her experience. Adjustments are not an exact science nor are they deemed unreliable or invalid if they have not previously been subject to peer review because the very nature of appraisal adjustments calls for a less rigid test of reliability and can hinge on an expert's experience. Eckmann's report and testimony explained why she performed certain adjustments and the value for each. Her size adjustment for residential properties, which we term the "halving the difference" adjustment, was designed—again like her 10% per doubling adjustment—to give effect to the fact that buyers do not pay for more land on a flat dollar-per-acre basis.[7] For this adjustment, Eckmann took the difference in acreage between the subject property and the compared property and divided the difference by two. She then multiplied that number (half the difference in size between the properties) by the value of the underlying land to arrive at her adjustment for size.

---

[7]Eckmann testified: "Well, as I previously testified, it's—it's my way of quantifying the fact that a person is buying a—a residence on two acres versus a residence on four acres. They'll pay more for the larger tract, but they won't pay you dollar for dollar more from the larger tract. They'll pay you some percentage more. In my opinion, that works out to about 50 percent more, is the way that works."

Again, making adjustments is part of the basic comparable-sales method. Although Eckmann's adjustments may not have met 100% of the guidelines of the Appraisal Institute, her possible deviation from those guidelines with respect to her adjustments does not make her conclusions legally unreliable. Instead, we look at her adjustments and determine whether too large a gap exists between her data and conclusions. *See LaSalle*, 336 S.W.3d at 317–18; *Hixon Family*, 365 S.W.3d at 872–74; *Kempwood Plaza*, 168 S.W.3d at 161. We cannot say that her adjustments demonstrate such a gap. It is appropriate for experts to support their opinions with their experience, and this is particularly true in the field of appraisal. The proper way of attacking shaky but admissible evidence is through cross examination. *Gammill*, 972 S.W.2d at 728.

Our independent review of the evidence does not reveal any gaps in Eckmann's testimony or misapplication of legal rules such that we would hold her testimony to have been unreliable. Because the evidence supports the jury's verdict, the trial court did not err in admitting the testimony and denying Williams's motion for JNOV.

## CALCULATING THE DEFICIENCY JUDGMENT

Williams's final two points of error relate to the trial court's calculation of the deficiency judgment against her. She claims the trial court erred by considering money paid by the highway construction company under the Possession and Use Agreement in calculating the deficiency and by failing to file findings of fact and conclusions of law. A deficiency judgment was necessary because Williams had already received or withdrawn money in excess of the jury's damages verdict. The Property Code requires the trial court to order the return of any excess award already "paid to or appropriated by the property owner." TEX. PROP. CODE ANN. § 21.044(b) (West 2004). The trial court held a post-verdict hearing to determine the amount of the deficiency judgment. *See* TEX. R. CIV. P. 270.

At the hearing, the evidence established that the highway construction company, in accordance with the Possession and Use Agreement, deposited the $183,000 with a title company. The title company disbursed $2,226 to the County Tax Collector, $57,694 to the bank that held a mortgage on part of the property, and $123,078 directly to Williams. Although Williams did not directly receive the whole sum, she received the benefit of the entire $183,000. The agreement itself states that "[t]he parties agree that the sum tendered hereunder will be deducted from any final settlement amount, purchase price, award or verdict for the fee title of the Property acquired by the State."

Williams agreed that the whole sum tendered under the agreement would be assessed against any award she received from the condemnation. She received the whole benefit of the award because it was used to pay off the lien and taxes she would have had to pay. She therefore "appropriated" the amount for the purposes of the Property Code and the court rightly accounted for that sum in its judgment. Williams does not offer any authority for the proposition that a sum of money already received by a condemnee must be pled by the condemnor before a court may account for that sum in its judgment. We decline to institute such a rule.

After the trial court rendered its judgment, Williams requested findings of fact and conclusions of law and then timely filed a notice of past due findings. *See* TEX. R. CIV. P. 296, 297. We will assume without deciding that her request for such findings in this case was appropriate. *But see* TEX. R. CIV. P. 296 (request for findings of fact and conclusions of law appropriate "[i]n any case tried in the district or county court without a jury . . . ."). Harm is generally presumed, but harmless error will be found if the failure to file does not impact the appellant's ability to prosecute her appeal. *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996) (per curiam). The basis for the trial court's judgment in this case is clear from the record and did not adversely impact Williams's ability to prosecute her appeal.

## CONCLUSION

We affirm the trial court's judgment in all respects.


Luz Elena D. Chapa, Justice