LEE ANN DAUPHINOT, JUSTICE
*492 This is an appeal from a condemnation award involving commercial property in Little Elm, Texas. The jury awarded Appellee Stephen Morale d/b/a Action Collision Repair and Appellee Kimberly Morale $1,064,335.00 for their property taken in the condemnation and for damages to their remainder property. In three issues, the State argues that the trial court abused its discretion by admitting evidence that the Morales had at one time been classified by the Texas Department of Transportation (TxDOT) as "displacees," by admitting evidence of an alternative compensation option based on their displacement, and by excluding certain testimony of a staff member and of an attorney for the Town of Little Elm. Because we hold that the displacement evidence and valuation testimony should not have been admitted and that the testimony of the Little Elm staff member and attorney was admissible, we reverse the trial court's judgment.
Background
The State of Texas, through the Texas Transportation Commission, planned to condemn a portion of property owned by the Morales in Little Elm for purposes of improving FM 720 in Denton County. The property was improved with an 8,831 square foot building used for the Morales' vehicle collision repair business. The State planned to take 3,200 square feet of land from the front of the Morales' 33,000-square-foot property. Because a corner of a metal canopy used by the business sat on the part taken, the State also planned to take the canopy.
In the course of its right-of-way project on FM 720, the State hired appraiser Jennifer Ayers to appraise the Morales' property. Initially, Ayers determined that after the taking, the property could still be used as a general auto repair shop but not as a collision repair shop. Ayers's decision arose from the removal of the metal canopy, the loss of parking spaces because of the taking, and, importantly, her recommendation that the Morales tear down part of their building to add back some of the parking that would be removed with the taking. She did not believe that the building could still be used as a collision repair shop after the removal of part of the building.
TxDOT has an administrative procedure to provide relocation services and benefits for businesses that must relocate because of TxDOT's exercise of eminent domain in its road projects.[2] Based on Ayers's determination that the use of the property would change from a collision repair shop to a general auto repair shop, the State classified the Morales as "displaced" and therefore entitled to relocation benefits for their business.
TxDOT classified the Morales as displaced in May 2012. The State filed its petition in condemnation in November of that year.
The State then hired land planner Ronan O'Connor, who developed a cure plan for reconfiguring the property to enable the Morales to continue operating their business on the site. O'Connor's plan did not involve tearing down part of the building, and it restored the metal canopy to another location on the property. In February 2013, Ayers revised her appraisal to *493 incorporate this cure plan. Ayers determined that under O'Connor's plan, the Morales' property could still be used as a collision repair shop.
In May 2013, the special commissioners rendered an award of $49,804. The Morales objected to the award and demanded a jury trial. The State revoked the Morales' displacee status on November 21, 2013.
The Morales hired their own appraiser and land planner. David Bolton, their appraiser, had developed an initial appraisal in May 2013 based on the assumption that the entire site would be demolished. Land planner Bill Carson then developed multiple cure plans[3] for reconfiguring the property to continue its use as a collision repair shop, ultimately recommending two of the plans. In 2014, Bolton developed an appraisal based on one of these two cure plans.
The Morales' property is zoned light commercial, and a collision repair shop is not an allowed use in that zoning. Some of the parking is not paved, and the town requires all commercial parking to be paved. But the business was in operation at that location before the zoning was put in place, and it therefore is grandfathered and considered legally nonconforming. Carson's cure plans incorporated changes that would make the property conform to the town's zoning ordinances.
Because the Morales' displacee status was revoked, the State moved pretrial to exclude any evidence relating to TxDOT's relocation program. The trial court ruled that the Morales could introduce evidence that TxDOT had at one point classified them as displaced, but they were not allowed to use the word "relocation" or to tell the jury that TxDOT had identified them as eligible for relocation benefits. At trial, the trial court granted the State a running objection to evidence and testimony about the term "displacees" and the Morales' previous classification as such.
The parties also disputed whether the Morales should be allowed to introduce evidence about Little Elm's zoning regulations and the effect they would have on the property. The trial court ordered that Little Elm staff could testify (1) about meetings and conversations with the Morales and the State about the Morales' business, (2) that the Morales had submitted two reconfiguration plans to Little Elm, and (3) that staff had recommended approval of those plans.
At trial, Dusty McAfee, who heads Little Elm's planning department, testified as a witness for the Morales. He testified about recommendations the town's staff had made for the Morales' reconfiguration plans based on Little Elm's ordinances. McAfee also testified that he had told O'Connor that he could submit his proposed plan for the property without the Morales' approval, but that neither O'Connor nor anyone else on behalf of the State had ever done so. The State offered the deposition testimony of Jason Laumer, Little Elm's engineer and McAfee's boss. Laumer testified that only a landowner or landowner's agent may formally submit plans to Little Elm and that in the town's formal process for a site plan review, the person submitting the site plan must sign to certify that the person is the legal owner of the referenced property.
The State made a bill of exceptions regarding the testimony of Robert Brown, Little Elm's attorney, and of further testimony *494 from Jason Laumer. It offered Brown's testimony to counter Carson's testimony that although the Morales had been legally nonconforming before the taking, if the Morales made changes to the property, they would have to cure the nonconforming uses before Little Elm staff would recommend approval of their plan.
At trial, Ayers testified that she had originally appraised the Morales' damages at $338,000. After receiving O'Connor's land plan, which restored the metal canopy and did not call for tearing down part of the building, and after determining that a billboard on the property would have to be removed, she adjusted her appraisal of the compensation owed to $122,953.
Bolton testified to two values. First, he testified to what he called his "displaced valuation" of $1,262,947, what he determined the Morales would be entitled to if the entire property were razed and all improvements torn down. He testified that if the Morales were not fully displaced, based on one of Carson's land plans, they were entitled to $1,064,335. Kimberly Morale testified that she and Stephen were requesting an award of $1,262,000 because they had been told they were displaced, and they believed that they were.
The jury found that the amount that would compensate the Morales for the taking was $1,064,335. The trial court signed a judgment awarding the Morales $1,064,355 in damages,[4] less the $49,804 that the State had already deposited with the court and the Morales had withdrawn.
Reviewing the Admission or Exclusion of Evidence
A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard.[5] When evidence is erroneously admitted or excluded, the error is reversible only if it probably caused the rendition of an improper judgment.[6] The admission or exclusion "is likely harmless if the evidence was cumulative, or [if] the rest of the evidence was so one-sided that the error likely made no difference in the judgment."[7] On the other hand, that admission or exclusion is likely harmful if the evidence was "crucial to a key issue."[8]
Condemnation awards
In addition to compensation for the taking of property, the Texas Constitution requires that a landowner be compensated when the State damages or destroys the landowner's property.[9] Accordingly, when only part of a landowner's property is physically appropriated, but the remainder of the landowner's property is damaged by the taking, the landowner is entitled to compensation for both the market value at the time of the taking for the part appropriated and for the damages caused to the remainder property.[10]
"The general rule for determining fair-market value is the before-and-after *495 rule, which requires measuring the difference in the value of the land immediately before and immediately after the taking."[11] "Fair market value" means "the price a willing buyer, who desires to buy but is under no obligation to buy, would pay to a willing seller, who desires to sell but is under no obligation to sell."[12] "The factfinder may consider the highest and best use of the condemned land," and "[t]here is a presumption that the highest and best use of the land is the existing use of the land."[13]
Condemnation and Displacee Status
The Transportation Code provides that if a transportation authority, "through the exercise of eminent domain, makes any relocation necessary, relocation assistance shall be provided by the authority."[14] TxDOT has adopted regulations for administering relocation assistance and benefits to persons displaced as a result of its right-of-way condemnations.[15]
Under these regulations, if a person is required to move from a business as a result of the acquisition of property for highway right-of-way purposes, that person is a displacee.[16] For such a person, the department "will pay the reasonable expenses of relocating the displacee and his or her business and personal property, so long as the eligibility requirements are met."[17] TxDOT considers a business to be displaced when only part of the business's property is acquired if "the partial acquisition renders [the] business ... unable to conduct business in the same or similar manner as prior to acquisition."[18]
Discussion
Evidence of Displacee Status
We begin with the State's second issue, in which it argues that the trial court abused its discretion by allowing evidence of the Morales' administrative classification as "displacees" and of TxDOT's rescinding of that classification. It argues that the evidence was irrelevant to the market value of the property at the time of the taking. And it contends that the introduction of the evidence was highly prejudicial and allowed the jury to consider the harm from the condemnation process to the Morales themselves, an injury that is noncompensable under Texas law. The State argues that the error therefore probably caused the rendition of an improper verdict.[19] We agree that the evidence was irrelevant and that its admission was harmful.
Evidence is not admissible if it is not relevant.[20] Evidence is relevant if it has "any tendency to make a fact more or less probable than it would be without the evidence"
*496 and "the fact is of consequence in determining the action."[21] Evidence that is relevant may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice or misleading the jury.[22]
The only issue at trial was the compensation owed to the Morales for the part taken and for any damages to the Morales' remainder property.[23] Accordingly, any evidence that was not relevant to that issue was not admissible.
The Morales wanted the evidence admitted to show that their property's highest and best use had changed and that the State had at one time acknowledged that fact. For the evidence of their displacement to support the Morales' position, the displacement would have to make it more probable that the taking changed the use of the property. It is true that the Morales were classified as displaced because TxDOT initially determined that after the taking, the Morales could not operate their business in the same manner as they had before the taking. TxDOT's conclusion on that point does, at first glance, make the evidence seem relevant to supporting the Morales' theory of damages and to discrediting the State's appraisal.
But on closer examination, the fact that the Morales were considered displaced does not make it more probable that the taking changed the use of their property, and it does not make it more probable that the State at one time believed that the taking itself caused a change in the property's use. The displacement classification was based on a combination of the effect of the taking and Ayers's proposed cure plan, and it therefore does not provide any indication of the State's opinion on what effect the taking alone had on the property.
Ayers's (and thus TxDOT's) conclusion about the change in the property's use came from her decision that part of the eastern side of the Morales' building should be torn down and parking added in its place. The part of the building she proposed tearing down was the part of the building where frame work is done, work that Ayers recognized was "an integral part of collision repair." On that basis, because of the loss of the frame work area and 2,800 square feet of the building, Ayers concluded that the property could no longer be used as a collision repair shop.[24] Because Ayers concluded that the property's use would change under her cure plan-not because of the taking of the canopy and the strip of land alone-the State classified the Morales as displaced.
It is possible that even if Ayers had not proposed a cure plan, she (and therefore TxDOT) would have concluded that the loss of parking and the metal canopy were enough to cause a change in the property's use, and TxDOT would have still classified the Morales as displaced.[25] After all, Ayers clearly believed that the loss of parking to *497 the business had some effect on the property given that she wanted to return parking to the property by removing part of the building.[26] But from the record, the most important factor leading to the displacement classification was Ayers's suggestion to remove part of the building. We can only guess what Ayers might have concluded about the property's use based on the taking of the land and the canopy alone. We cannot speculate about what TxDOT might have done under other circumstances, and the record does not show that TxDOT agreed that the taking of the land and the canopy alone rendered the property unfit for a collision repair shop, even when it classified the Morales as displaced. Thus, the displacement classification does not make it more probable that the taking -that is, the taking of the land and the metal canopy-caused the Morales' property to no longer function for a collision repair shop.
The displacement classification is even less relevant to the Morales' claim that the property's highest and best use was as vacant land for redevelopment. The Morales did not expressly testify that their property would only sell to prospective buyers as vacant land for redevelopment, but they took that position at trial. They asked the jury to award them $1,262,000, in line with the amount that their appraisal expert determined was an accurate measure of their damages if the property could only be sold to a buyer who would demolish the improvements and redevelop the property. Ergo, they sought damages based on a claim that the existing improvements had no positive effect on the property's market value after the taking.
Ayers's opinion was that implementing her cure plan meant that the property after the taking was suitable for a basic automotive service facility. Nothing in the record indicates that TxDOT classified the Morales as displaced because no business would want the property as it existed after the taking. Nothing in the record indicates that Ayers or TxDOT ever agreed with the Morales on that point, even while the Morales were classified as displaced. Ayers's appraisal and cure plan did not reach that conclusion, and TxDOT relied on her cure plan and appraisal in classifying the Morales as displaced. Thus, evidence of the classification of the Morales as displaced did not make it more probable that their property after the taking had a highest and best use as vacant land for redevelopment. Such evidence was therefore not relevant to their theory of damages.
The Morales also argue that they believe they are effectively displaced. But the evidence's relevance comes not from what the Morales believe on that point but on what TxDOT believed when it classified the Morales as displaced. What the Morales believe about the effect of the taking does not make the evidence relevant. Further, "displaced" is an administrative category, the relevant agency denied that status to the Morales, and they did not seek review of that decision. We will not second-guess the agency's decision. The Morales were free to testify about the problems with their property after the taking, but under the circumstances, their view on whether TxDOT should have not revoked their displacee status and thus whether they were in fact still "displaced" within the meaning of the regulations was not relevant.
The displacement categorization was, however, important to the Morales' trial strategy. They used the evidence to suggest *498 that the State's valuation testimony and evidence was false and that the State had withdrawn the displacement classification and lowered its offer solely because the Morales had rejected the condemnation award. In a pretrial hearing, the Morales' attorney stated that the Morales were going to testify about the condemnation process, including the displacement process, and that "the way [they']ve been treated throughout the process if you view all the evidence and documents, quite frankly, is not fair." The trial court twice asked him how that kind of testimony related to the market value of the property, and their attorney's answer was to say, circularly, that the evidence "gives [the Morales] a basis to say, 'Hey, the process that we've been through is unfair to us.' "
In the Morales' opening statement, their attorney argued that TxDOT had classified them as displaced, but "[d]id TxDOT ever offer them compensation consistent with being a displaced property? No." He stated that TxDOT rescinded the displacement status and that "I'm going to tell you upfront the evidence in this case is going to show you [that] that was done for purposes of this litigation."
Kimberly's testimony equated the term "displacement" with diminished functionality of the property, despite providing no testimony explaining why, if the property had diminished function, the only use for the property was to raze the improvements and redevelop it. Without explaining why diminished functionality necessarily meant no functionality, she nevertheless asked the jury to award the Morales the $1,262,000 displacement valuation as damages on the basis that they had been told they were displaced. Her repeated use of the word "displaced" in her testimony to discuss the effect the taking had on their property was a direct effort to tie her statements about the property's functioning to the evidence that TxDOT had at one time classified the Morales as displaced.
The Morales' attorney questioned the State's witnesses in a way that pointedly suggested that the State's revocation of displacement status was suspicious. The Morales' attorney asked Lisa Cisneros, the third-party agent who coordinated the relocation benefits process for TxDOT, about this and other projects she had worked on for TxDOT and how many times she had seen TxDOT designate a landowner as displaced and then withdraw that designation, eliciting testimony that she had seen it only once before. The area of questioning did not add any new information about the property's market value before or after the taking. It did not add to the jury's understanding of conditions on the property before or after the taking. Its only purpose was to suggest to the jury that there was something abnormal about the revocation.
The Morales' attorney then asked Lezlie Kirby, a TxDOT employee, about an email exchange she had with Cisneros and others relating to the Morales' relocation benefits. The attorney pointed out that the email said that Cisneros, Kirby, Kirby's boss, and the attorney from the attorney general's office handling the litigation in the condemnation case needed to have a conference call and "make sure [they] are all on the same page." The Morales' attorney then asked, "And ultimately, when you all got on the same page with ... the lead lawyer in the litigation, the next day you rescind the Morales' designation as displaced persons, right?" Kirby disagreed with the attorney's implication, to which he replied that he was "just saying" that her statement that they needed to discuss withdrawing the displaced designation "included TxDOT's lead litigation lawyer from the AG's office ..., right?" Kirby explained that she made that statement "because [she] didn't have the time limit of *499 events because [she] was not involved in the case." The Morales' attorney then passed the witness.
Kirby had been asked by the State about the fact that the Morales had not sought review of the determination that their displacee status was revoked. On cross-examination, the Morales' attorney asked Kirby, "the appeal of the property owner is right back to TxDOT, right?" The employee answered in the affirmative, and the Morales' attorney then immediately switched topics. That question did not lead to any other questions about the review process and was not linked to any other factors needed to establish market value at trial. The question's only purpose, then, appeared to be to suggest that it would have been pointless for the Morales to seek review-that is, to suggest that the Morales would not have received a fair hearing from TxDOT in the review process.
Then, in their closing argument, the Morales' attorney told the jury, "TxDOT identified the Morales as displaced but never really treated them as displaced and never offered to compensate them as displaced." And they represented that O'Connor had deliberately manipulated his land plan to "get to a result that maybe the State likes, not the result that's an accurate analysis of the property."
From the record, it is clear why the Morales wanted the displacee evidence admitted. The Morales continually suggested to the jury that not only was the State's revocation of displacement status not correct, it was spurious and motivated by the Morales' contesting the special commissioners' award. The Morales' attorney painted a picture for the jury that the TxDOT employees withdrew the displacee designation only because the lawyer from the attorney general's office told them to, that the attorney general's office gave that instruction only because the Morales had rejected the special commissioner's award and were taking the matter to trial, and that the TxDOT employees and experts colluded with the attorney general's office to come up with an alternative explanation for the withdrawal. They placed significant emphasis throughout trial on the evidence of their former displacee status and used that evidence to paint a picture of themselves as landowners being treated unfairly by the State. It would be hard to conclude that the irrelevant displacement evidence likely had no effect on the jury.[27]
The Morales argue that the jury is presumed to follow the trial court's instructions and that the jury was instructed not to award damages to the Morales personally. But the instruction to which they refer told the jury not to award compensation for any inconvenience or annoyance the Morales personally experienced during the construction of the roadway. Thus, a jury following this instruction could nevertheless have been swayed in reaching its verdict on market value by sympathy for the Morales.
The Morales argue that the State judicially admitted that the Morales had been *500 classified as displaced by admitting that fact in their answers to the Morales' requests for admissions and that the State agreed that the admissions could be admitted at trial.[28] However, evidence must be relevant to be admissible.[29] The State has never denied that the Morales were once classified as displaced. The State's admission in discovery that the Morales had previously been classified as displaced did not prevent it from objecting to the introduction of displacement evidence at trial.[30]
As for the State's agreeing to admit its admissions as an exhibit, the trial court held a pretrial hearing for the parties to agree to or obtain rulings on their proposed trial exhibits. The State's agreement to its admission being introduced as an exhibit was made at this hearing, the third pretrial hearing at which the issue of displacement was discussed. The matter was thoroughly discussed at all three hearings. Before discussion of the exhibits, the trial court made it quite clear in its rulings that it would allow testimony and evidence about displacement. At that third hearing, even the Morales' attorney acknowledged that the issue had been extensively argued, stating with respect to the use of the word "relocate" that he did not "want to go back through every one of these exhibits and reargue again what the Court has already ruled upon." The trial court had previously heard the parties' arguments on these specific admissions and had overruled the State's objections to them. Given the trial court's rulings, the State had no reason to object again to the admission of its discovery response on that matter.
The Morales further argue that the State did not raise in the trial court its objection that the evidence of displacement was prejudicial. The Morales are mistaken; the State objected in a pretrial hearing that the issue would be "confusing to the jury and certainly prejudicial." Then, the issue came up again in a pretrial hearing on the parties' motions in limine, and the trial court stated that although the Morales could introduce testimony about the process, including the displacement classification and revocation, but that "it's prejudicial [to say] that ... the process is unfair."
Whether the taking process seems fair to the landowner is not a factor in determining market value, and evidence on that point was irrelevant and, in this case, induced the jury to base its verdict on something other than evidence of market value.[31] We agree with the State that "the only conclusion that can be drawn from the record was that the Morales thought the displacee testimony and evidence was extremely important to their case" and that "this testimony and evidence was never used in any relevant way-as probative of market value-but instead only in a manner calculated to create unfair prejudice." Because this evidence was crucial to a key issue at trial-indeed, the only issue at trial-the allowance of this evidence probably *501 caused the rendition of an improper judgment and was therefore harmful.[32]
We do not suggest that the Morales may not introduce evidence that O'Connor's cure plan is inadequate or credible. Of course they may do so. Nor do we hold that Ayers's first appraisal is not relevant or admissible. And the Morales may introduce relevant evidence that the State's appraisals are not credible. But they may not use irrelevant evidence to induce the jury to base its verdict on passion or sympathy. We sustain the State's second issue.
Displaced Valuation Testimony
In its first issue, the State argues that the trial court abused its discretion by admitting the Morales' $1.2 million displaced valuation through Bolton's and Kimberly's testimony. We have already held that the trial court's opinion must be reversed, but because the arguments about the admissibility of this testimony are likely to come up again upon retrial, we will address them.[33]
"[C]ourts should admit as market-value evidence such matters as suitability, adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the remainder's market value."[34] "A condemnee 'may recover damages which are reasonably foreseeable, and he (or she) may show the reasonably probable uses of the tract taken that are calculated to depress the value of the remainder tract and thus enhance the recovery of damages.' "[35] "Damages due to required modifications to the remainder as a result of the condemnation, or damages due to a loss of improvements on the remainder because of the condemnation may, on a proper showing, be compensable."[36] But evidence is not admissible if it relates " 'to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property.' "[37]
"The presumed highest and best use of land is that of its existing use," but this presumption may be rebutted.[38] "Unless an appraisal gives a value based on the land's condition at the time of condemnation-taking into account all relevant factors that affect its valuation, including the market for its possible future use-it is not relevant to the issue of market value."[39]
The Morales were permitted to show that after the taking, the property's highest and best use was no longer as a collision repair shop but as vacant land for redevelopment. But Bolton's $1.2 million appraisal did not help them do that because the appraisal simply assumed that the Morales would have to relocate their business and in that in that case, the improvements *502 could not remain on the property. In other words, he assumed that the site would no longer work as a collision repair shop and then further assumed that a prospective buyer would not believe the improvements could work for any purpose and would therefore tear down the improvements and redevelop the site.
But even with the uncertainty that the town would require nonconforming uses to be cured in order for a business to operate out of the existing improvements, it does not automatically follow that the property's highest and best use is as vacant land for redevelopment. Not only that, but Bolton's own comparable sales that he used to form an opinion of market value before the taking were of general auto repair businesses, suggesting that there is a market for property that can be used for such business. His $1.2 million appraisal was based on a use that was speculative and unsubstantiated, and his market value testimony was therefore irrelevant and inadmissible.[40]
The Morales counter that their classification by TxDOT as displaced was evidence of the fact that the property's highest and best use was as vacant land and that it gave factual support to Bolton's appraisal and market value opinion. But let us look at what that classification actually showed. First, under the Morales' own evidence, a nonresidential landowner will be considered displaced by TxDOT when only part of their property is acquired if "the partial acquisition renders a business ... unable to conduct business in the same or similar manner as prior to acquisition." [Emphasis added.] Under this definition, TxDOT will consider a business to be displaced even if the property as improved will still support a business of some sort. The business is considered displaced if the property will no longer support that same business, operated in the same manner as before the taking. The displacee classification was therefore not evidence that after the taking, no business could operate on the property.
Further, Ayers suggested tearing down part of their building. She did not suggest tearing down all of the improvements. And the partial demolition would have, in Ayers's opinion, made the property not suitable for the Morales' business, but she concluded it could still operate as a general auto repair business. Thus, neither the factual basis for displaced classification nor the act of TxDOT classifying them as such supported their contention that the property's highest and best use was as vacant land.
The State argues that Kimberly's testimony was also speculative and unsubstantiated. We agree. Her testimony of the property's value after the taking was based entirely on Bolton's displacement appraisal. Nor did Kimberly's testimony provide factual support for Bolton's appraisal. Kimberly testified about why she believed the property would no longer support their business after the taking, but she did not testify about why it could not support any business, and the record did not show that she was qualified to do so even if she had. Thus, Kimberly's testimony provided no support for her opinion on the displacement market value after the taking and could not provide support for Bolton's.
The Morales counter that even O'Connor, the State's expert, testified that the Morales were in the best position to give testimony about the impact of the taking on their property. The State and its witnesses agreed that Kimberly was qualified to testify about whether the business could *503 still operate there. But the State did not concede that Kimberly could testify about why no business could operate there, and she testified to no facts along those lines.
The Morales argue that Bolton testified that it is still uncertain what Little Elm will allow the Morales to do with the property. The Morales are correct that an appraiser may testify about the effects of uncertainty-but the way to make that uncertainty relevant is to appraise the property as what a prospective buyer would pay and a willing seller would accept at the time of the taking given that such uncertainty exists.[41] Bolton's appraisal went further than that and presumed that the property's improvements would be torn down. That went beyond evaluating how a buyer would weigh the risk of Little Elm's possible future action against the property and instead assumed a particular course of action by the town.
And in his testimony, Bolton said that if Little Elm did not approve Carson's cure plan, "it could be the other ($1.262 million) appraisal." [Emphasis added.] Thus, while his appraisal presumed a highest and best use as vacant land, his testimony was also speculative, stating not how a willing buyer at the time of the taking would weigh the risk of future government action, but stating what the future value of the property might be if the government took a particular action.
The Morales make several preservation arguments attacking the State's first issue, none of which we find persuasive. The Morales first argue that the State waived any error on this issue because it agreed that the Morales could testify to Bolton's displacement appraisal. They point to where the State's attorney said that his objection to Stephen's testimony at a pretrial hearing on the matter was moot.
The statements were made in the context of a hearing on the parties' motions to strike various witnesses. The trial court had already ruled that Bolton's appraisal could come in. The State objected that the Morales' displacement market value opinion was based on nothing but Bolton's appraisal. Stephen then testified at the hearing so that the trial court could rule on the State's objections to the Morales' proposed testimony. After his testimony, the State's attorney stated that his previously-raised objection was "relatively moot" because the trial court had already ruled that Bolton's appraisal testimony was admissible. The trial court agreed with the State's attorney on that point.
It was clear from the context of the hearing that the trial court understood the State's objection. Given that the Morales' testimony was (by trial court ruling) tied to Bolton's testimony, that the trial court had ruled that Bolton's testimony was admissible, and that the trial court agreed that the State's objection to Stephen's testimony was therefore moot, the State did not waive its objection that the Morales had to provide a factual basis for their opinion of market value.
*504 The Morales also argue that the State's pretrial motion to exclude Kimberly' testimony about the Morales' displacee status did not include an objection about the factual substantiation of her market value opinion. The attorneys for the parties had extensive discussions at one of the pre-trial conferences about the basis of the Morales' testimony regarding their compensation opinions. Thus, we cannot agree that the State did not raise this complaint in the trial court.
The Morales further argue that the State did not raise a separate issue on appeal complaining of Bolton's testimony. The State did not challenge Bolton's testimony in a separate issue, but it clearly raised arguments challenging it, and its arguments were fairly included in its first issue.[42]
The Morales argued that their exhibit 60 contained a summary of Bolton's May 2013 opinion, and the State did not object to its admission, and thus the State waived any objection to the evidence of the displacement valuation. They also contend that this exhibit provides evidence on which the Morales and their experts could rely regarding the displacment valuation. That summary includes a list of the comparable sales Bolton had used to develop his appraisal. But the appraisal was based on the assumption that the improvements would be torn down, and the summary does not include any factual basis for that assumption. It therefore does not provide the missing factual support.
As for the Morales' preservation argument, the trial court had already ruled orally and in writing that the testimony was admissible. Once the trial court had made its ruling, there was no necessity for the State to raise the same objections to an exhibit merely summarizing Bolton's testimony, used during his own testimony.[43]
The Morales further argue that even if the evidence was not admissible, it was not harmful. We do not decide if the admission was harmful because we have already held that trial court's judgment must be reversed.[44]
We do not say that the appraisal was not an accurate measure of the fair market value of the property as vacant land. But because the appraisal was based on a land use that was speculative and unsubstantiated, the displacement market value testimony was irrelevant and therefore inadmissible. We sustain the State's first issue.
Excluded Testimony
In its third issue, the State argues that the trial court abused its discretion by excluding the testimony of Robert Brown and certain testimony of Jason Laumer. The State argues this testimony was admissible as evidence of a potential buyer's evaluation of possible future town action and to rebut what it contends was a false *505 impression created by McAfee's testimony about the likelihood of town staff's recommendations for the property being adopted by the town council. This court previously held in Little Elm that when a property owner's damage theory concerns how the government's actions may affect the value and use of property,
an expert may testify about how an uncertainty with regard to a governmental action may have affected the market value (in other words, how potential buyers and sellers would weigh the risks related to the property) on the date of the taking, but an expert may not opine about how that uncertainty will actually be resolved [o]n a date after the taking when that opinion is speculative or conjectural.[45]
McAfee testified that the Morales had formally submitted an application for prospective development of their property, and town staff gave them feedback "about what town staff's suggested changes needed to be for the plans." He stated that town staff are familiar with the town's ordinances (including ordinances 918 and 954, discussed below) and code provisions and take those provisions into consideration when making recommendations for changes to submitted plans. He testified that the Morales' applications have note sections on the plans and that staff had requested that the note sections be included on the plans "so it was clear what town staff was requesting the Morales include." The notes included on the staff report to the town council indicated that the changes requested by staff were "the bare minimum necessary per staff's understanding of the ordinances" and the bare minimum staff would recommend for approval by council.
McAfee also testified about the effect of two town ordinances. Ordinance 918 provides that if a right-of-way acquisition by a government agency causes property to be in violation of the town's zoning ordinances or other ordinances, the property is exempt from those provisions unless the agency offers the property owner compensation for "the demolition of improvements or for other curative measures."[46] Ordinance 954 states that it was adopted because the town council had determined that ordinance 918 needed a process for waivers and variances.
Ordinance 954 applies when a taking has caused a property to be in violation of town zoning and development ordinances and the property owner has received compensation from a government agency to cure the violation, but the owner contends that the compensation is inadequate to pay for the modifications that would be required to cure.[47] In that case, the property owner may apply for a waiver or variance from the applicable ordinances.[48] Under the ordinance,
the town council may grant a waiver or variance from any town standard or requirement that is not considered a life-safety standard or requirement if the town council finds that[, because the owner has not received enough compensation to cover the costs that would be incurred in complying with ordinance 918,] the imposition of a particular town standard or requirement upon a property *506 owner will result in an undue hardship to [the] owner.[49]
The council may further grant a variance for non-life-safety requirements if the council finds that enforcing the requirements "(i) is not in the best interest of the public; (ii) constitutes waste or inefficient use of land or other resources; (iii) is not effective or necessary; or (iv) is not in the best interest of the town."[50]
McAfee testified that the staff considered these two ordinances in making their recommendations to the Morales about what changes they needed to make to their property in order for staff to recommend the approval of their applications. The State wanted to use Brown's and Laumer's testimony to rebut McAfee's testimony.
A party in a condemnation case may introduce evidence of all reasonable foreseeable or reasonably probable circumstances that a prospective buyer would consider in evaluating the property's present market value.[51] The Morales could not elicit testimony from McAfee that the town would definitely require the Morales to make all the changes necessary to bring the property into conformance because that testimony would be speculative. But they wanted his testimony as evidence that the town's imposing such requirements was reasonably probable. If the upgrades to the property requested by staff and incorporated by Carson into his plan were merely possible and not reasonably probable, then McAfee's testimony was not admissible to prove the market value of the property.[52] Thus, in eliciting McAfee's testimony about the Morales' land plans and the town staff's comments and understanding of the ordinances, the Morales were taking the position that a prospective buyer would weigh the prospect of the town's adoption of the staff's recommendations as reasonably probable. The same is true of their relying on Bolton's appraisal, which was based on Carson's plan incorporating staff's comments, and of their arguing to the jury that O'Connor's plan was not credible because it did not incorporate McAfee's comments.
The State was allowed to counter McAfee's testimony by putting on evidence that, a prospective buyer, in determining market value, would believe that the town's imposition of the requirements was not reasonably probable. The State attempted to do that through the testimony of Laumer and Brown. If the offered testimony was relevant to circumstances a prospective buyer would consider in reaching a market value determination, then it was admissible.[53]
The Morales objected that the two witnesses' testimony was impermissible because the testimony was an attempt to tell the jury that because the town had granted variances in the past, the town would definitely grant the Morales a variance. They also argued that under the trial court's previous ruling, neither side "would be allowed to interpret or give a spin or give an explanation or a hypothetical as to *507 how [the ordinances] might be applied to the Morales." The trial court ruled that the evidence was not admissible. The State argues that the evidence was admissible because the only evidence presented to the jury about the supposed uncertainty of the town's future action was the testimony about the town staff's recommendations on the Morales' plans and that "[t]his created a false impression that the town council would eventually require these recommendations."
Laumer is the director of development services for Little Elm and McAfee's boss. He made the following statements in his testimony:
• To his knowledge, only a landowner or a landowner's representative may submit a site plan for a property;
• (Contrary to Kimberly's testimony that town staff recommended it,) if the Morales do not change the size of their building, the parking requirements for their site will not change;
• (Contrary to Kimberly's testimony,) if TxDOT did not acquire the part of the property with the septic system, Little Elm cannot require the Morales to replace their septic system and connect to Little Elm's sewer system;
• He met with O'Connor about O'Connor's land plan and offered comments on that plan;
• Under his understanding of ordinance 918, Little Elm would not require anything above and beyond what would be covered by the compensation the Morales received for the property;
• Under ordinance 954, Little Elm may grant variances to property owners affected by TxDOT's right-of-way condemnations; and
• Little Elm had previously granted variances for other properties affected by the TxDOT road project.
Laumer further testified about some of the details for some of the properties that were given variances. For example, he discussed a property for which TxDOT had paid compensation for the owner to demolish part of their building but for which Little Elm subsequently granted a variance so that the owner was not required to demolish any part of the property. Laumer agreed that he could not say one way or the other whether the town council would take a particular action regarding the Morales' property.
As for Brown's testimony, he stated that Little Elm has granted variances to property owners under ordinance 954, and he named several businesses that had obtained variances. He stated that the intent of the town council in passing the ordinances was that TxDOT would not be required to compensate a landowner more than what TxDOT contended it could lawfully pay a property owner. He testified that it is the town's intent to not require property owners to make modifications in order to cure nonconforming uses that arise from a TxDOT condemnation if the compensation TxDOT provides to those property owners are not enough to cover the costs of the modifications. He stated that consequently, Little Elm would consider granting variances for nonconforming uses that do not create a health or safety issue. He testified that Little Elm's town council has a history of working with businesses through the application of the ordinances to allow the businesses to stay in operation, but he did not know what the town council might do regarding the Morales' property.
In determining whether to buy and how much to offer for the Morales' property, a prospective buyer would weigh the risk of *508 the town taking regulatory action against the property. The Morales took the position at trial that in weighing the risk, the prospective buyer would consider the town staff's opinion about what the town's ordinances required the Morales to do to their property and the planning director's position that staff would not recommend that council approve a plan that did not meet the staff's recommendations, which included, for example, connecting the property to the town's sewage system. And, by asking the jury to award damages based on an appraisal that was in turn based on a land plan incorporating the staff recommendations, the Morales asked the jury to find that it was reasonably probable that the town will require the Morales to implement the staff's recommendations.
The State was entitled to rebut the Morales' position and to put on its own evidence of what circumstances a prospective buyer would consider. A prospective buyer would consider the fact that the town has granted variances under ordinance 954 in the past to property owners affected by the same right-of-way project, as well as Laumer's and Brown's disagreement with McAfee on the interpretation of the ordinances and how they applied to the Morales' property. This information was relevant to Bolton's understanding of how prospective buyers would weigh the risk of the town taking action against the property and how that would affect what a prospective buyer would offer for the property.[54]
Further, a prospective buyer would look at the facts of past instances of the council's granting variances to make a conclusion about the foreseeability of the town granting a variance on the Morales' property. Thus, the State should have been allowed to ask Laumer and Brown about other properties for which variances had been granted under the ordinances. We agree with the Morales that the State cannot use the evidence of variances the town has previously granted to other property owners to imply that the town will grant the Morales' a variance for their property. But a blanket prohibition of such testimony was not proper. And in any case, in their direct and cross-examinations in their bill of exceptions testimony, Brown and Laumer testified that it was uncertain what the town council would do regarding the Morales' property and that the granting of variances by the council was fact-specific, such that past granting of variances did not mean that council would necessarily grant a variance for the Morales. As far as testimony implying future council action, there is little discernible difference between McAfee's boss testifying about past instances when variances had been approved and the Morales asking the jury to award damages based on Bolton's appraisal based on Carson's land plan incorporating changes that McAfee testified were the "bare minimum" required for staff to recommend approval.
Laumer's and Brown's proposed testimony was similar to McAfee's in that they testified about how they interpreted the ordinances and their application to the property without predicting what action the council would take. Excluding this evidence prevented the jury from considering circumstances that a prospective buyer would consider.[55] We sustain the State's third issue.
*509 Conclusion
The trial court's handling of this contentious trial and the voluminous evidentiary objections of the parties was commendable. We nevertheless conclude that its judgment must be reversed. Having sustained the State's three issues, we reverse the trial court's judgment and remand this case for further proceedings.
GABRIEL, J., concurs without opinion.

Tex. Transp. Code Ann. § 460.107(c) (West Supp. 2016).

Carson stated at a pretrial hearing, "I think I stated I've done a hundred, and that may not be an exaggeration. I've probably worked on many, many plans," none of which the Morales liked.

The trial court's judgment does not explain the $20 difference between the amount found by the jury and the amount awarded by the trial court.

Gharda USA, Inc. v. Control Sols., Inc. , 464 S.W.3d 338, 347 (Tex. 2015).

Tex. R. App. P. 44.1(a) ; Caffe Ribs, Inc. v. State , 487 S.W.3d 137, 144-45 (Tex. 2016).

State v. Cent. Expressway Sign Assocs. , 302 S.W.3d 866, 870 (Tex. 2009) (op. on reh'g).

Id.

Tex. Const. art. I, § 17 ; Felts v. Harris Cty. , 915 S.W.2d 482, 484 (Tex. 1996).

Westgate, Ltd. v. State , 843 S.W.2d 448, 456 (Tex. 1992) (op. on reh'g).

Exxon Pipeline Co. v. Zwahr , 88 S.W.3d 623, 627 (Tex. 2002).

Wise Elec. Coop., Inc. v. Am. Hat Co. , 476 S.W.3d 671, 698 (Tex. App.-Fort Worth 2015, no pet.).

Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC , 386 S.W.3d 256, 261 (Tex. 2012) (citation omitted).

Tex. Transp. Code Ann. § 460.107(c).

43 Tex. Admin. Code § 21.111 -.118 (2016) (Tex. Dep't of Transp.).

Id. § 21.111(3).

Id. § 21.116.

See Tex. Dep't Transp., Right of Way Manual Vol. 3-Relocation Assistance 2-9 (2013 ed.), http://onlinemanuals.txdot.gov/txdotmanuals/rel/manual_notice.htm).

See Tex. R. App. P. 44.1(a)(1) (stating that a trial court error is reversible if it probably caused the rendition of an improper verdict).

Brookshire Bros., Ltd. v. Aldridge , 438 S.W.3d 9, 26 (Tex. 2014).

Tex. R. Evid. 401.

Tex. R. Evid. 403.

See State v. Petropoulos , 346 S.W.3d 525, 531 (Tex. 2011).

Ayers said in her report and testimony that the property's use would change under her plan, but she did not specifically say in her report or her testimony that the highest and best use of the property had changed. However, as discussed below, Lezlie Kirby agreed in her testimony that TxDOT had classified the Morales as displaced "because, based on Jennifer Ayers' appraisal, the highest and best use of that property had changed because of the State's take."

See Tex. Dep't Transp., Right of Way Manual Vol. 3-Relocation Assistance 2-9 (stating that a business is displaced if it cannot operate in the same manner after a partial acquisition of the business's property).

Cf. Oddo v. State , 912 S.W.2d 831, 833 (Tex. App.-Dallas 1995, writ denied) (holding that, in that case, the landowner's damages resulting from parking space lost because of the taking were recoverable).

See Kia Motors Corp. v. Ruiz , 432 S.W.3d 865, 884 (Tex. 2014) (stating that the record demonstrated "significant emphasis throughout trial on the overwhelming number of [warranty] claims that were not relevant" and that "[t]he sheer volume of irrelevant yet prejudicial information presented to the jury in that document and the consistent focus on it at trial ... make it very difficult to overlook the likely effect it had"); Heddin v. Delhi Gas Pipeline Co. , 522 S.W.2d 886, 889-90 (Tex. 1975) (holding that inflammatory photographs admitted at trial "were not calculated to aid the jury in its understanding of the case" and "must be construed as an attempt to appeal to the prejudice and passion of the jury").

See Tex. R. Civ. P. 198.3 (providing that an admission by a party under rule of civil procedure 198 is conclusively established as to the party making the admission unless the admission is withdrawn or amended).

Tex. R. Evid. 402 (providing that irrelevant evidence is not admissible).

Cf. In re Commitment of Hernandez , No. 09-12-00329-CV, 2013 WL 5302615, at *3 (Tex. App.-Beaumont Sept. 19, 2013, no pet.) (mem. op.) (stating that there is no conflict between civil procedure rule 198 and the sexually violent predator statute, and therefore, "if relevant to the disputed issues, a trial court may allow a party's responses to the opposing party's requests for admission to be used as evidence in [sexually violent predator] cases" (emphasis added) ).

See Tex. R. Evid. 401, 402 ; Tex. R. App. P. 44.1(a)(1).

See Tex. R. App. P. 44.1(a)(1) ; Cent. Expressway Sign , 302 S.W.3d at 870.

See State v. Little Elm Plaza, Ltd. , No. 02-11-00037-CV, 2012 WL 5258695, at *15 n.17 (Tex. App.-Fort Worth Oct. 25, 2012, pet. dism'd) (mem. op.) (addressing issue that would likely arise on retrial in the interest of judicial economy).

Coble v. City of Mansfield , 134 S.W.3d 449, 454 (Tex. App.-Fort Worth 2004, no pet.).

Id. (citation omitted).

Id. at 455 (quoting State v. Centennial Mortg. Corp. , 867 S.W.2d 783, 784 (Tex. 1993) ) (internal quotation marks omitted).

State v. Stockton Bend 100 Joint Venture , No. 02-14-00307-CV, 2016 WL 3198960, at *9 (Tex. App.-Fort Worth June 9, 2016, pet. filed) (quoting State v. Schmidt , 867 S.W.2d 769, 773 (Tex. 1993) ).

Enbridge Pipelines , 386 S.W.3d at 264.

Id.

See Schmidt , 867 S.W.2d at 773.

See Little Elm , 2012 WL 5258695, at *12 (stating that in a condemnation case, an expert may testify about how potential buyers and sellers would weigh the risks with regard to a governmental action and the effect that may have had on the market value of the property on the date of the taking, "but an expert may not opine about how that uncertainty will actually be resolved in a date after the taking when that opinion is speculative or conjectural"); see also Crosstex DC Gathering Co., J.V. v. Button , No. 02-11-00067-CV, 2013 WL 257355, at *16 (Tex. App.-Fort Worth Jan. 24, 2013, no pet.) (mem. op.) (stating that the appraiser in that case had appropriately testified about how potential buyers and sellers would weigh the probability of the property's zoning being changed).

See Tex. R. App. P. 38.1(f).

See, e.g. , Guadalupe-Blanco River Auth. v. Kraft , 77 S.W.3d 805, 807 (Tex. 2002) (holding that when the appellant objected to a witness's appraisal testimony and was overruled, the appellant preserved error on the admission of the testimony even though the appellant did not object when the appellee tendered a summary of the witness's appraisal).Cf. City of Fort Worth v. Holland , 748 S.W.2d 112, 113 (Tex. App.-Fort Worth 1988, writ denied) (recognizing a line of cases expressing that "a party making a proper objection to the introduction of testimony of a witness, which objection is overruled, may assume that the judge will make a similar ruling as to other offers of similar evidence" and limiting that rule "to those instances where the similar evidence is elicited from the same witness").

See Tex. R. App. P. 47.1 (requiring courts of appeals to hand down written opinions that are as brief as practicable).

Little Elm , 2012 WL 5258695, at *12.

Little Elm, Code of Ordinances ch. 22, art. VII, § 22-167(3)(a) (2016), available at https://www.municode.com/library/tx/little_elm/codes/code_of_ordinances.

Id. § 22-167(7)(a).

Id.

Id. § 22-167(7)(b).

Id. § 22-167(7)(c).

See City of Pearland v. Alexander , 483 S.W.2d 244, 247 (Tex. 1972).

Id. at 248-49 (reversing a trial court's award of damages for the landowner's remainder property because the trial court had instructed the jury to presume that the entire part taken would be used as a sewage disposal plant and stating that "the public authority should not be required to pay severance damages on the basis of uses of the tract taken which are not at the time of the taking so reasonably probable as to be reflected in present market value").

See ids="10054401" index="41" url="https://cite.case.law/sw2d/483/244/#p247">id.

See McKinney I.S.D. v. Carlisle Grace, Ltd. , 222 S.W.3d 878, 883 (Tex. App.-Dallas 2007, pet. denied) ("In Texas condemnation law, market value properly reflects all factors that buyers and seller would consider in arriving at a sales price.").

See Little Elm , 2012 WL 5258695, at *12 (holding that an expert may testify about how potential buyers and sellers would weigh the risk of potential government action related to the property that may have affected the market value of the property on the date of the taking).