**Affirmed and Memorandum Opinion filed August 13, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00793-CV

## KELLY CUSTOM HOMES, LLC AND ROBIN KELLY, Appellants

## V.

## RODNEY HOPPER AND LYNDSAY HOPPER, Appellees

**On Appeal from the 40th District Court**
**Ellis County, Texas**
**Trial Court Cause No. 108060**

## M E M O R A N D U M   O P I N I O N

A jury found that a property developer damaged a neighboring landowners' property by intentionally and maliciously trespassing on, and diverting surface water over, the neighboring property. On appeal, the developer challenges the legal basis of the landowners' water diversion claim, as well as the legal and factual sufficiency of the evidence supporting the jury's various damages findings. We affirm the judgment.

## Background

Rodney and Lyndsay Hopper purchased a house on approximately two acres of heavily wooded land with a creek. The couple, their three children, and their three dogs moved into the house in June 2021. Developer Robin Kelly owned the neighboring 147-acre tract, which he—through his company Kelly Custom Homes ("KCH")—planned to develop into a residential community of 200 houses known as King's Ranch.[1]

In August 2021, Kelly's employees entered the Hoppers' property and cut down trees on 7,000 square feet of their land. The Hoppers told Kelly that he was trespassing on their land, and he offered them $200 in compensation. Kelly promised to mark the boundary line between the properties, but he never did. Rodney testified that "where there was a forest now there's mud and dirt and just, you know, crab roots."

In September 2021, Kelly's employees constructed a drainage channel from King's Ranch across the Hoppers' property to the creek. The workers also constructed a "gabion wall."[2] Lyndsay confronted the construction workers, one of whom told her "I'm just doing what, you know, I'm supposed to do." The employee told Lyndsay that Kelly "told him to do it."

Regarding the harm to the Hopper's property caused by Kelly's ditch, Rodney said, "We have an increase in erosion, an increase in sediment, dirt, topsoil coming through. After they built the wall we started to get a lot of trash into the creek and onto our property. Found things, plastic, hockey sticks, like toy hockey

---

[1] The parties refer to Kelly and KCH collectively as "Kelly," so we do as well, unless otherwise indicated to distinguish between them.

[2] One of the Hoppers' witnesses testified that a gabion wall is "just some rocks essentially wrapped in . . . chicken wire, to help slow down the flow of water and to catch big -- big trash, anything like that, sediment but still let the water flow through the voids in the rocks."

stick, beer cans, water bottles, Powerade bottles, empty oil cans. You know, and that's in addition to just general debris, sticks, mud, dirt, rocks."

Both Rodney and Lyndsay testified about the mental and emotional toll Kelly's actions caused them. We detail this evidence subsequently.

Lance VanDemark testified as a licensed professional engineer. The Hoppers retained VanDemark to review the design and the construction of the King's Ranch project and how the drainage ditch affected the downstream properties. VanDemark testified that the drainage ditch "increased the flows to the historic discharge point. . . . Increased the velocity. There was additional sediment that's being discharged due to those increases which has caused erosion on the downstream property." VanDemark stated that "there was no proposed drainage channel" on Kelly's construction plans, nor did the plans propose a gabion wall. Another witness, Robert Young, testified as an expert in land surveying and stated that there are absolutely no easements that allow Kelly to "do anything on the Hoppers' property."

Josh Korman testified as an expert in real estate appraisal. According to Korman, Kelly's actions reduced the value of the Hoppers' property by $140,000, which represented a twenty percent diminution in value.

Kelly testified and did not dispute clearing the trees and vegetation without permission or constructing the drainage ditch without permission. He testified that he built the gabion wall for "erosion control" and that it was "state mandated." According to Kelly, the city inspector told him where to build the gabion wall and he had no discretion. Kelly promised to do whatever he could to remedy the situation, but he never heard from the Hoppers until they filed this lawsuit. Kelly testified that there has not been any change to the flow of water in and around the creek since the Hoppers bought their property.

3

The Hoppers sued Kelly and KCH for common-law trespass and unlawful diversion of surface water under section 11.086 of the Texas Water Code. The jury found that Kelly and KCH trespassed on the Hoppers' property, that the trespasses were intentional and malicious, and that Kelly and KCH diverted or impounded the natural flow of water onto the Hoppers' property. The jury awarded $140,000 in actual damages ($70,000 for the trespass and $70,000 for the water diversion), $150,000 in mental anguish damages, $400,000 in exemplary damages ($100,000 against Kelly and $300,000 against KCH), attorney's fees, expert fees, post-judgment interest, and costs of court. By a permanent injunction, the court ordered Kelly to desist and refrain from entering the Hoppers' property without permission and to desist and refrain from taking any action, including but not limited to any further construction or excavation on the neighboring property that could direct or increase any surface water flow onto the Hoppers' property.

Kelly timely appealed.

## Standard of Review

When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *See id.* at 827. To sustain a challenge to the legal sufficiency of the evidence supporting a jury finding, the reviewing court must find that: (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the

4

evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004).

When reviewing the factual sufficiency of the evidence, we examine the entire record, considering all the evidence both in favor of and contrary to the finding. *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 723 (Tex. App.—Houston [14th Dist.] 2017, no pet.). When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

We apply these standards mindful that this court is not a fact finder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact is the sole judge of witnesses' credibility and the weight afforded their testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16; *see also City of Keller*, 168 S.W.3d at 819-20. Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would also support a different result. *GTE Mobilnet*, 61 S.W.3d at 615-16.

5

**Analysis**

The Supreme Court of Texas ordered the Tenth Court of Appeals to transfer this case to our court. *See* Tex. Gov't Code § 73.001. We are unaware of any conflict between Tenth Court of Appeals precedent and that of this court on any relevant issue. *See* Tex. R. App. P. 41.3.

**A.     Water Code claim**

In his first issue, Kelly argues that the Hoppers cannot recover on their Water Code claim because (a) the evidence establishes conclusively that Kelly constructed improvements to "control overflows and floodwater" and (b) there is no evidence that Kelly diverted "surface water" onto the Hoppers' property.

The Texas Water Code provides that "[n]o person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." Tex. Water Code § 11.086(a). This prohibition does not apply in certain situations:

> The prohibition of Subsection (a) of this section does not in any way affect the construction and maintenance of levees and other improvements to control floods, overflows, and freshets in rivers, creeks, and streams or the construction of canals for conveying water for irrigation or other purposes authorized by this code. However, this subsection does not authorize any person to construct a canal, lateral canal, or ditch that obstructs a river, creek, bayou, gully, slough, ditch, or other well-defined natural drainage.

*Id.* § 11.086(c).

Kelly never argued to the jury that his actions were intended to control any alleged flooding. Nevertheless, Kelly argues on appeal that the evidence conclusively established that Kelly's actions "were improvements to control floods

6

and overflows," and thus he is not liable under section 11.086(a)'s prohibition. To support this assertion, he cites a portion of VanDemark's testimony and accompanying exhibits, in which VanDemark stated that Kelly's construction plans did not show a proposed drainage ditch, that the drainage channel was constructed without any grading, and that Kelly's construction plans included a proposed detention pond on his land, but Kelly never constructed a detention pond. VanDemark testified that a detention pond would have been important "to mitigate the excess flow." Kelly also cites his own testimony that he believed either local or state authority required him to build the gabion wall.

This testimony does not establish conclusively that Kelly's property was experiencing flooding or that Kelly built the drainage ditch on the Hoppers' property to control floods. Kelly's reliance on subsection (c)'s exception is unavailing.

Kelly also argues that there is legally insufficient evidence that he diverted surface water onto the Hoppers' property.

Question No. 11 asked:

Did Robin Kelly divert or impound the natural flow of surface water, or permit a diversion or impounding to continue, in a manner that damaged the Plaintiffs' property?

The term "divert" includes increasing the quantity and/or velocity of surface water or runoff.

With respect to the natural flow of water from a property of higher elevation, a lower estate must receive the surface waters naturally flowing thereon from a higher estate, yet it is not required to receive these waters except in their natural condition, untouched by the hands of man. In other words, the proprietor of higher land is entitled to have surface water flow to the lower land, so long as the water follows its usual course and runs in its natural quantities.

7

The jury charge did not define "surface water," and Kelly did not object to the lack of a definition. Additionally, Kelly has not directed us to a citation in the record where witnesses were asked whether the term "surface water" was a term that had a technical or customary meaning. Thus, we must measure the sufficiency of the evidence against the commonly understood meaning of "surface water." *Fenner v. Samson Res. Co.*, No. 01-03-00049-CV, 2005 WL 2123043, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2005, pet. denied) (mem. op.) (construing "surface" according to its plain and ordinary meaning where neither parties' agreement nor jury charge defined the term); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (holding, when no objection is made to jury charge, sufficiency of evidence is measured against charge given rather than some other unidentified law). "[T]he word 'surface' has been defined as 'the upper boundary or top of ground or soil, exposed to the air.'" *Fenner*, 2005 WL 2123043, at *3 (quoting Oxford English Dictionary 287 (2d ed. 1993)). The ordinary meaning of "surface water" reasonably can include water that flows across the surface of a parcel of land.

The evidence showed that Kelly constructed a channel or ditch that diverted water, most especially rainwater, from his property onto and over the Hoppers' property. VanDemark testified that Kelly's actions increased the quantity and velocity of "runoff water" from Kelly's property onto the Hoppers' property. Rodney and VanDemark both testified that the diversion created by Kelly damaged the Hoppers' property. The jury reasonably could find from the evidence presented that Kelly "divert[ed] or impound[ed] the natural flow of surface water . . . in a manner that damaged the Plaintiffs' property." *See Boatman v. Lites*, 970 S.W.3d 41, 44-45 (Tex. App.—Tyler 1998, no pet.) (evidence that defendant's

8

berms diverted surface water, which damaged plaintiffs' property, supported jury's finding of a section 11.086 violation).

We overrule Kelly's first issue.

## B.    Damages

### 1.    Diminution in value

In his second issue, Kelly argues that there is legally insufficient evidence to support the jury's finding that the Hoppers' property diminished in value as a result of Kelly's challenged actions.    According to Kelly, Korman "pulled the 20% number out of thin air," and thus his expert testimony was conclusory and without evidentiary value.

Conclusory testimony cannot support a judgment because it is considered no evidence.  *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (reasoning that "if no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence"); *see also Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.").  An expert's testimony is conclusory when the expert asserts a conclusion with no basis.  *See Pollock*, 284 S.W.3d at 818; *see also Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 159 (Tex. 2012) (concluding that property valuations may not be based on the owner's or the expert's *ipse dixit*—that is, they "may not simply echo the phrase 'market value' and state a number to substantiate [the] diminished value claim; [the expert] must provide the factual basis on which his opinion rests").  The expert must link his conclusions to the facts, explaining the basis of his assertions. *See Coastal Transp.*

*Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) ("[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law."). Asking the jury to take the expert's word for it because of his status as an expert will not suffice. *See Pollock*, 284 S.W.3d at 816.

As a general rule the proper measure of damages in cases involving injury to real property is "the cost to restore or replace, plus loss of use for temporary injury, and loss in fair market value for permanent injury." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014). The Texas Supreme Court has cautioned that this rule should be applied with flexibility and with consideration of the facts and circumstances of the case. *See id.* When valuing real property, the comparable sales method of determining the market value of real property is a traditional method—and the preferred method—of determining the market value of real property. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). "Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property." *Id.* Making adjustments is particularly appropriate for real estate experts to support their appraisal opinions with their experience. *See Williams v. State*, 406 S.W.3d 273, 291 (Tex. App.—San Antonio 2013, pet. denied) (analyzing expert market value opinions in a condemnation proceeding).

Korman testified that he has been a certified general real estate appraiser for fifteen years. The Hoppers asked him "to appraise the property basically in its impaired position and unimpaired and if there was any diminution in value." He reviewed documents produced in discovery, made a site inspection, looked at historical imagery of the property, and gathered data on comparable sales. He

10

analyzed what the value of the Hoppers' property would be "as if . . . the actions of the . . . defendants had never happened." Korman started with analyzing the North Texas market and then narrowed "all the way down to the Hoppers' property itself and the neighborhood that it sits in." He gathered "market information," specifically "comparable sales. Sales of other similar type homes." In other words, he "looked at other comparable properties that had sold to come up with the value of the property as unimpaired."

When developing his appraisal opinion of the diminution in value of the Hoppers' property, Korman reviewed four comparable sales, three on the Hoppers' street and another one "on the other side of I-35 that had some similar features to the Hoppers' property." He later clarified that the fourth comparable was "probably four or five miles away, but it was in a subdivision and it actually backed up to a wooded creek . . . [and] was about two acres in size."

In Korman's opinion, the value of the Hoppers' property as "unimpaired" was $700,000, but it suffered a diminution in value as a result of Kelly's actions and was worth $560,000. Korman opined that the destruction of the "natural barrier" on one side of the property and the lack of privacy and security impaired the property's value, as did the encumbrance of the ditch and gabion wall.

The record reflects that Korman used comparable properties—other homes on the Hoppers' street and a nearby home with comparable property features—to derive a comparable sales approach of an unimpaired value for the home and that his reduction of $140,000 was explained by him as being based on the damage caused by the tree removal and the water diversion. Kelly had an opportunity to, and did, cross-examine Korman, but Kelly offered no competing testimony on the value of the Hoppers' property, either in its unimpaired or impaired state.

11

Based on this record, we cannot agree that Korman's testimony was conclusory or ungrounded on facts. There is some evidence to support the economic damages, and we overrule Kelly's second issue. *See LaSalle Pipeline L.P. v. Donnell Lands, L.P.*, 336 S.W.3d 306, 317 (Tex. App.—San Antonio 2010, pet. denied) (expert's comparable-sales analysis was not conclusory and supported finding of diminution in value).

In his third issue, Kelly argues that there is no evidence to support the jury's "arbitrary division" of damages attributable to the Water Code claim and to the trespass claim. Of the $140,000 diminution, Korman testified that "[a]pproximately 50 percent" was attributable to the tree and vegetation removal and the other fifty percent was attributable to the water diversion. He tied the separate actions—tree removal or water diversion—to specific and discrete damage to the Hoppers' property and opined that each harm lessened the property value by approximately $70,000. Specifically, the tree removal "eroded" the privacy and security of the property, and the drainage ditch is an encumbrance on the property that does not benefit the Hoppers.

As just discussed, we conclude that legally sufficient evidence supports the jury's compensatory damages findings. Kelly does not cite any authority suggesting that an expert improperly allocates property damage caused by two separate harms. We overrule Kelly's third issue.

2. Mental anguish damages

In his fourth issue, Kelly argues that there is legally and factually insufficient evidence to support any award for compensable mental anguish.

Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment, although

12

it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). "[A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Id.*; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011) (stating that when an occurrence is of the type for which mental anguish damages are recoverable, "evidence of the nature, duration, and severity of the mental anguish is required"). When a claimant fails to present direct evidence of the nature, duration, or severity of mental anguish, courts apply a traditional no-evidence standard to determine whether the record reveals any evidence of "a high degree of mental pain and distress" that is more than mere worry, anxiety, vexation, embarrassment, or anger, to support any award of damages. *Parkway Co.*, 901 S.W.2d at 444. We are charged with conducting a meaningful evidentiary review of such awards, just as we do for economic damages. *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002); *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).

Kelly does not dispute that mental anguish is compensable when it results from real property damage caused by an intentional or malicious trespass and if the mental anguish is proven in accordance with supreme court precedent. Our court and others have concluded that mental anguish damages are recoverable in some cases when the defendant's conduct is intentional or malicious. *See Sankaran v. VFS Servs. (USA) Inc.*, ---S.W.3d---, 2024 WL 3188610, at *5 (Tex. App.—Houston [14th Dist.] June 27, 2024, pet. filed); *Parenti v. Moberg*, No. 04-06-00497-CV, 2007 WL 1540952, at *3 (Tex. App.—San Antonio May 30, 2007, pet. denied) (mem. op.); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979

13

S.W.2d 730, 753-57 (Tex. App.—Houston [14th Dist.] 1998, no pet.).[3] The jury was instructed not to answer the mental anguish damage question unless it found that Kelly had trespassed intentionally. After finding that Kelly trespassed intentionally, the jury awarded the Hoppers $150,000 in mental anguish damages resulting from the intentional trespass.[4]

a. *Compensable mental anguish*

We first consider Kelly's arguments that the Hoppers did not prove with legally or factually sufficient evidence that they suffered compensable mental anguish under *Parkway Company*.

Both Rodney and Lyndsay testified about the mental anguish they suffered, which continued for two years. Rodney testified that "90 percent of our marriage we've been dealing with this. It is a dark cloud that's hanging over -- hanging over everything." The couple took time away from their kids and their jobs and "burned through [their] savings." Rodney felt like he lost two years of his life and two years of his children's lives to this "dark thing." Rodney said he and Lyndsay have felt stress, anxiety, helplessness, and anger and that there are times "when it breaks [Lyndsay] down." Lyndsay suffered hair loss because of the stress. The couple was forced to cancel their planned backyard wedding, which was "devastating" to Lyndsay.

This constitutes direct evidence of the nature, duration, and severity of appellees' mental anguish sufficient to survive a legal sufficiency challenge. *See, e.g., Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018) (evidence that

---

[3] In 1997, the supreme court reserved the question of whether mental anguish arising from property damage might be available when a degree of culpability higher than simple negligence is found. *City of Tyler v. Likes*, 962 S.W.2d 489, 497 (Tex. 1997).

[4] The jury also found that Kelly's trespass was committed with malice, but the mental anguish damage question was not conditioned on an affirmative finding of malice.

plaintiff's familial relationships were impacted, his demeanor changed, he was unable to sleep, and he was treated for anxiety and depression was some evidence he suffered compensable mental anguish); *Parenti*, 2007 WL 1540952, at *3-4 (crying, vomiting, loss of sleep, and missing work held legally sufficient to support recoverability of mental anguish); *Carpenter v. The Holmes Builders, Inc.*, No. 11-02-00132-CV, 2004 WL 306130, at *6 (Tex. App.—Eastland Feb. 19, 2004, pet. denied) (mem. op.) (testimony that life was "on hold" for years and feelings of anxiety, embarrassment, helplessness, worry, and stress, coupled with eye infection, loss of sleep, and crying, was legally sufficient evidence of mental anguish); *Teledyne Expl. Co. v. Klotz*, 694 S.W.2d 109 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) (plaintiff's testimony that he was disoriented, shocked, felt violated, and was choked up was some evidence of mental anguish stemming from defendant's bulldozing of trees). We therefore hold that the Hoppers presented legally sufficient evidence of compensable mental anguish.

Further, after reviewing all of the evidence relevant to mental anguish, we hold that the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the award should be set aside and a new trial ordered. The jury's finding that the Hoppers suffered compensable mental anguish is not clearly wrong and unjust. We reject Kelly's arguments that the Hoppers failed to present legally and factually sufficient evidence that they suffered compensable mental anguish as a result of Kelly's intentional trespass.

Kelly argues that Rodney and Lyndsay testified only to the existence of "mere emotions," citing *Waste Disposal Center, Inc. v. Larson*, 74 S.W.3d 578, 585 (Tex. App.—Corpus Christi 2002, pet. denied) (finding no evidence of mental anguish in trespass case where plaintiff's testimony only "refer[red] to the existence of 'mere emotions'"). We disagree. Appellees' testimony described

15

more than mere "worry and anxiety," though it certainly included those emotions. In addition to experiencing the emotions of stress, anger, helplessness, and anxiety, they also testified that they felt that they had "lost" two years of their lives and their children's lives. They lost time from their jobs and spent their savings. Lyndsay suffered physical manifestations of her stress. This type of direct evidence satisfies *Parkway Company*. *See Carpenter*, 2004 WL 306130, at *6.

We overrule Kelly's fourth issue.

### b. *Amount of mental anguish damages*

In his fifth issue, Kelly assails the *amount* of mental anguish damages, contending that it lacks any "rational basis" in the evidence. He relies heavily on *Gregory v. Chohan*, 670 S.W.3d 546 (Tex. 2023) (plurality op.), but that case is a plurality opinion lacking precedential value,[5] and a majority of justices on the supreme court have not adopted some of the standards he advocates in his brief. Nonetheless, Kelly notes several applicable principles guiding our review of the amount of a mental anguish award. Broadly speaking, claimants must present evidence sufficient to justify the amount awarded. *See Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Bentley*, 94 S.W.3d at 606. Juries must find an amount that "would fairly and reasonably compensate" for the loss; they cannot "simply pick a number and put it in the blank." *Id.* Compensation can only be for mental anguish that causes "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." *Id.* (citing *Parkway Co.*, 901 S.W.2d at 444).

---

[5] *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *D.M. Diamond Corp. v. Dunbar Armored, Inc.*, 124 S.W.3d 655, 659 n.6 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

And the amount cannot be based on mere passion, prejudice, or improper motives or measurements. *Gregory*, 670 S.W.3d at 564 n.16 (plurality op.); *id.* at 570 (Devine, J., concurring); *id.* at 576 (Bland, J., concurring in part).

We conclude that the $150,000 amount awarded, though high, is reasonably supported by the evidence described above, given the nature, duration, and severity of appellees' mental anguish. The Hoppers testified to experiencing mental anguish daily over an extended period of two years. The amount awarded is not unreasonable when considered in light of the other compensatory damage awards. *See Carpenter*, 2004 WL 306130, at *6. Moreover, courts have upheld comparable mental anguish awards in other non-personal injury cases, including cases concerning significant damage to real property. *MBR & Assocs., Inc. v. Lile*, No. 02-11-00431-CV, 2012 WL 4661665, at *12-13 (Tex. App.—Fort Worth Oct. 4, 2012, pet. denied) (mem. op.) (affirming $250,000 mental anguish award for damage to plaintiffs' home foundation that made house uninhabitable); *Carpenter*, 2004 WL 306130, at *6 (rejecting legal and factual sufficiency challenge to $150,000 mental anguish award in real property damage case); *see also Anderson*, 550 S.W.3d at 620-21 (upholding remitted mental anguish damages of $150,000 in defamation case).

Kelly directs us to *Lakeside Village Homeowners Association, Inc. v. Belanger*, 545 S.W.3d 15, 37 (Tex. App.—El Paso 2017, pet. denied) ($3,500 and $1,500 mental anguish awarded for trespass), and *Larson*, 74 S.W.3d at 585 ($25,000 mental anguish damages). The courts of appeals in these cases reversed the mental anguish awards because the claimants presented no legally sufficient evidence of compensable mental anguish, not because the awards were excessive. Kelly's cited cases do not support the proposition that the jury's mental anguish

award here is outside the range of fair and reasonable compensation, given the evidence of compensable mental anguish that the Hoppers presented.

Kelly does not contend that appellees' counsel engaged in the type of irrelevant, "unsubstantiated anchoring" that a majority of supreme court justices agreed in *Gregory* is impermissible. *See Gregory*, 550 S.W.3d at 557-58 (plurality op.); *id.* at 569 (Devine, J., concurring). Additionally, we do not see any basis in the record for concluding that the mental anguish award was the result of passion, prejudice, or improper motives or measurements.[6] The jury heard about the nature, duration, and severity of the Hoppers' mental anguish and that the Hoppers took time away from their jobs and their children and drained their savings. The jury awarded $50,000 more than requested by counsel during closing argument, but that is permissible so long as it reflects a reasonable determination based on the evidence. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000) (a jury may award more damages than requested by a party if there is evidence supporting the higher award of damages). The jury reasonably could have concluded that the mental anguish damages adequately compensated the Hoppers for their distress,

---

[6] Kelly points out that the Hoppers' counsel suggested a per diem guide for mental anguish damages during closing argument. Appellees' counsel urged:

> [Y]ou saw and heard about the pain, the stress, the anguish my clients have gone through. Saw it on their faces. Heard it in their voices. . . .

> As of today it's been 697 days since the [bulldozers] rolled in. 697 days that they've been living with this. How do you put a dollar amount on that? How much -- how much per day do you think they should be compensated? . . .

> Let's say you go back there and y'all collectively decide that it should be $150 a day. That's $75 per person. If you multiply that by 697 days that's just over $100,000.

> I would submit to you that at least $100,000 is warranted in this case.

Kelly did not object to this argument as an impermissible measurement for mental anguish, and in any event we cannot conclude the suggestion resulted in an improper judgment when the ultimate damage amount found by the jury has a reasonable evidentiary basis. *See* Tex. R. App. P. 44.1(a).

their financial worries, and the loss of enjoyment of their property for two years. We conclude that the amount awarded is not excessive.

We overrule Kelly's fifth issue.

3. Exemplary damages

In his sixth issue, Kelly argues that there is legally and factually insufficient evidence to support the jury's exemplary damages award, namely that he or his company acted with malice.

The jury was asked if it found by clear and convincing evidence that Kelly's and KCH's trespasses were committed with malice. The charge defined malice as:

1. a specific intent by [Kelly and/or KCH], to cause substantial injury to Plaintiffs; or

2. an act or omission by [Kelly and/or KCH],

> a. which when viewed objectively from the standpoint of [Kelly and/or KCH], at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

> b. of which [Kelly and/or KCH], has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

The evidence established the Kelly entered the Hoppers' property without permission and bulldozed dozens of trees. Even though he was told that he was trespassing on the Hoppers' land, he returned and constructed a permanent drainage ditch that diverted substantial volumes of water onto the Hoppers' property. These acts involved an extreme degree of risk of damage to the Hoppers' property. *See Boatman*, 970 S.W.2d at 46 ("destruction of a sizable portion of real property by erosion was, objectively, serious harm, and [ ] the diversion of surface waters by the Boatmans constituted an extreme danger that that particular harm would occur").

19

The evidence also established that Kelly knew the risks involved but proceeded with conscious indifference to the Hoppers' rights. Kelly is an experienced developer and submitted development plans for governmental approval. Those plans did not involve cutting down the Hoppers' trees or constructing a drainage ditch on their property. The Hoppers told Kelly that he was trespassing on their property, and they told Kelly's employees to stop their work. The Hoppers were ignored, and the work continued. This shows that Kelly acted with conscious indifference. *Vaughn v. Drennon*, 202 S.W.3d 308, 342 (Tex. App.—Tyler 2006, pet. denied) (defendant's acts of clearing land behind plaintiffs' property and building earthen dams, which caused unprecedented flooding onto plaintiffs' land, involved an extreme degree of risk of which the defendant had actual, subjective awareness and of which he consciously disregarded); *see also Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 614 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (defendant who was aware his conduct blocked drainage and intentionally permitted impounding to continue was liable for punitive damages.); *Pargas of Longview, Inc. v. Jones*, 573 S.W.2d 571, 574 (Tex. App.—Texarkana 1978, no writ) ("Pargas's agents made the entry upon Jones's premises willfully and deliberately after having been warned no[t] to do so" and the invasion of property was an unlawful entry).

Kelly contends that cutting down the Hoppers' trees was merely a mistake and that he believed building the drainage canal was necessary for erosion control. Kelly's reasons for cutting down the trees and building the ditch are disputed facts that the jury reasonably could have resolved against him. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). The jury could have found Kelly's testimony about his "good faith, reasonable belief" to have been not credible. *See City of Keller*, 168 S.W.3d at 822.

20

We hold that there is some evidence to support the jury's exemplary damages award. We further hold, after reviewing all the evidence in the record, that there is factually sufficient evidence as well. We overrule Kelly's fifth issue.

**Conclusion**

We affirm the trial court's judgment.


/s/    Kevin Jewell
        Justice


Panel consists of Justices Jewell, Bourliot, and Poissant.